**INDIANA–KENTUCKY ELECTRIC CORPORATION, Petitioner,**

v.

**INDIANA DEPARTMENT OF STATE REVENUE, Respondent.**

**OHIO VALLEY ELECTRIC CORPORATION, Petitioner,**

v.

**INDIANA DEPARTMENT OF STATE REVENUE, Respondent.**

Nos. 02T10–9104–TA–00014, 02T10–9104–TA–00015.

Tax Court of Indiana.

Aug. 19, 1992.

Milford M. Miller, Philip L. Carson, Miller Carson & Boxberger, Fort Wayne, for petitioner.

Linley E. Pearson, Atty. Gen., Marilyn S. Meighen, Deputy Atty. Gen., Indianapolis, for respondent.

FISHER, Judge.

Indiana–Kentucky Electric Corporation and Ohio Valley Electric Corporation appeal the Indiana Department of State Revenue's (Department) assessment of gross income tax, adjusted gross income tax, and supplemental net income tax, including interest and penalties for the years 1985, 1986, and 1987, on sales of electricity to two Indiana purchasers. The cases were heard and decided together because the relevant facts are substantially the same. Furthermore, this opinion is decided on the same day as two other cases [1] that dispose of similar issues.

## FACTS

The Ohio Valley Electric Corporation (OVEC) is an Ohio corporation engaged in the business of generating and selling electrical energy. OVEC's general offices are located in Piketon, Ohio. OVEC has gener-

---

1. *Bethlehem Steel Corp. v. Indiana Dep't of State Revenue* (1992), Ind. Tax, 597 N.E.2d 1327; *First Nat'l Leasing and Fin. Corp. v. Indiana Dep't of State Revenue* (1992), Ind. Tax, 598 N.E.2d 640.

ating facilities in Gallipollis, Ohio (Kyger Creek) and transmission lines and other related equipment located in Ohio and Kentucky, but none in Indiana. OVEC is not a resident or domiciliary of Indiana, and has no office, sales activities, inventory, or physical presence in Indiana.

Indiana–Kentucky Electric Corporation (IKEC) is an Indiana corporation, wholly owned by OVEC. IKEC's generating facilities are located near Madison, Indiana (Clifty Creek) and its transmission lines and other related equipment are located exclusively in Indiana.

OVEC was formed by fifteen sponsoring companies, all public electric utility companies, for the sole purpose of supplying the United States Atomic Energy Commission, currently the Department of Energy (DOE), with all the electrical energy needed for the operation of its uranium enrichment plant located near Portsmouth, Ohio. The large amount of energy required for the process of uranium enrichment, however, is beyond the capacity of OVEC alone. To ensure that it could meet its obligations under the power agreement with the DOE, OVEC entered separate power agreements with IKEC and the fifteen sponsoring companies.

According to the IKEC–OVEC power agreement, the entire output of power IKEC generates is sold to OVEC. Under OVEC's power agreement with the fifteen sponsoring companies, the companies sell electricity to OVEC when the demands of the DOE exceed the amount OVEC can generate and purchase from IKEC. Additionally, the agreement permits the sponsoring companies to purchase surplus electricity from OVEC, when the demands of the DOE fall below the total amount OVEC can generate and purchase from IKEC.

A provision designating the points at which title passes, *i.e.*, the points of delivery, is a standard term in electric utility industry power agreements because the seller of power cannot direct the power it sells to a specific point of delivery. Provisions designating the point of delivery additionally assure that utilities buying and selling power have sufficient transmission facilities to carry the power being sold. The title to IKEC's electricity passes upon delivery, as defined by the power agreement, at the Indiana–Kentucky state line. The title to electricity purchased from or sold to OVEC by the sponsoring companies passes upon delivery, as defined by the power agreement, at one of thirteen interconnection points, none of which are in Indiana.

OVEC's power agreements with both IKEC and the sponsoring companies also contain a "wheeling agreement," an agreement by an intermediate electric utility permitting its transmission facilities to be used to transmit power when there is a sale between two utilities that are not directly interconnected. The wheeling agreements provide that IKEC and the sponsoring companies will "wheel" supplemental power to or from OVEC as necessary when OVEC is not directly interconnected with the seller or purchaser. Wheeling agreements are standard provisions in power agreements to guarantee that adequate transmission capacity is always available to meet the variable demands for electricity by permitting utilities that do not directly interconnect to connect indirectly using the facilities of other utility companies.

OVEC's general offices in Ohio house the teletype equipment used to communicate with the sponsoring companies as well as sophisticated computer control equipment used to regulate the level of electric generation at both the Clifty Creek and Kyger Creek plants under the direction of OVEC's load coordinator. The load coordinator must coordinate on an hourly basis the electrical supply available to OVEC with its delivery commitments to ensure OVEC's supply of power is equal to its contractual sale obligations.

Two of OVEC's sponsoring companies are domiciled in Indiana. The first, Indiana Michigan Power Company (IM), formerly Indiana & Michigan Electric Company, is one of four of OVEC's sponsoring companies that is a subsidiary of the American Electric Power Company (AEP). Teletype communications between OVEC and the four AEP subsidiaries, including IM, take

place between Piketon and the AEP system control center in Columbus, Ohio. The second, Southern Indiana Gas & Electric Company (SIGECO) is located near Evansville, Indiana where it receives and sends teletype communications to OVEC in Piketon.

IKEC, OVEC, IM, and SIGECO are four of over two thousand (2,000) electric utilities in the Eastern Interconnection, an interconnected grid system covering much of the eastern two-thirds of the United States. An interconnected grid system is a complex assemblage of transmission lines and power plants that are all directly or indirectly connected to one another. The Eastern Interconnection includes virtually all the electric facilities east of the Rocky Mountains, fourteen hundred (1400) generating facilities, and over two hundred and forty thousand (240,000) miles of transmission lines. Electric utility companies form interconnected grid systems to provide economical and reliable transmission of electricity where and when it is needed.

Electricity cannot be stored, therefore, it must be produced the moment it is demanded. If more electricity were produced than was actually demanded, the power frequency on the system would exceed 60 megahertz (60 cycles), and the result would be catastrophic. Both utility companies and consumers purchase equipment designed to operate at 60 cycles; a deviation from that frequency would damage the equipment.

Although generation and transmission are temporally successive events, transmission so instantaneously follows generation they seem simultaneous. Thus, when electricity is produced by one of the 1400 generating plants in the Eastern Interconnection, it is almost simultaneously introduced onto the interconnected grid system. The path electricity travels cannot be directed; it will flow over any path available to it, according to the laws of physics. Although the impedance or resistance of the various pathways determines how much power flows over one particular line, some power flows over every part of the interconnected grid system and is instantaneously commingled with all the electricity present. Consequently, electricity present at any individual interconnection within the Eastern Interconnection system is a combination of all the electricity produced at all the generating plants within the Eastern Interconnection.

Bernard Pasternack, manager of the Bulk Transmission Planning Division of the AEP, conducted several studies related to OVEC's sales to IM and SIGECO. Pasternack used computer simulated power flow studies to produce mathematical models that would replicate the behavior of electricity in transmission systems, including the Eastern Interconnection. Pasternack developed two models to examine the percentage of the electricity OVEC sold to IM and SIGECO that is "produced, transmitted, delivered and consumed in Indiana." The results of the first model showed that in 1985 0.50%, in 1986 0.48%, and in 1987 0.47% of the annual energy actually consumed by IM and SIGECO was generated by IKEC at Clifty Creek. Pasternack's second study was based on the false assumption that all the energy transmitted on the interconnected grid system was generated by either IKEC or OVEC. The results showed that in 1985, 1986, and 1987, only about 3.5% of the power sold by OVEC to IM was "produced, transmitted, delivered and consumed in Indiana."

In 1971, IKEC and the Department negotiated an agreement that neither IKEC or OVEC owed gross income tax. In addition, for purposes of the adjusted gross income tax, the Department agreed to an apportionment formula based on a three factor formula in which the sales factor was zero, indicating IKEC did not make Indiana sales. In 1976, following an audit and subsequent protest by IKEC, the Department reaffirmed the 1971 findings and apportionment formula. In 1982, the Department audited IKEC again to redetermine taxability based on the requirement that OVEC and IKEC file Indiana returns on a unitary basis. The 1982 agreement did not assess gross income tax on either OVEC or IKEC, and the adjusted gross income tax apportionment formula indicated a sales factor of zero for both OVEC and IKEC.

In 1986, the Department audited IKEC and OVEC and assessed gross income tax against both on the same grounds as in the instant case. Furthermore, the Department increased the apportionment formula sales factor for adjusted gross income tax from zero, indicating IKEC and OVEC made sales within Indiana. Following the denial of their protests, OVEC and IKEC filed original tax appeals in this court. Five days prior to trial, however, the Department withdrew its assessment.

After an audit in 1989, the Department assessed gross income tax on IKEC, based on OVEC's sales to IM and SIGECO in the amounts of $54,025.78 for 1985, $112,839.86 for 1986, and $324,450.71 for 1987. The Department issued its letter of findings denying IKEC's protest based on regulations 45 I.A.C. 1–1–119(e) and 45 I.A.C. 1–1–119(2)(a), alleging a portion of the electricity IKEC sells to OVEC never leaves Indiana to enter Ohio; but instead, the electricity is delivered to OVEC's Indiana customers by IKEC at OVEC's direction.

Similarly, after a 1989 audit of OVEC for the years 1985, 1986, and 1987, the Department assessed gross income tax and additional adjusted gross income tax and supplemental net income tax on OVEC's income from sales of power to IM and SIGECO. The assessments totalled $119,633.88 for 1985, $582,934.79 for 1986, and $437,017.08 for 1987. The Department issued a letter of findings denying OVEC's protest, stating that OVEC's income received from sales to IM and SIGECO was not exempt under IND.CODE 6–2.1–3–3 because it was not derived from interstate commerce.

Additional facts appear below as necessary.

### ISSUES

I. Is the part of IKEC's gross income received from the sale of electricity to OVEC that equals the amount of electricity OVEC sells to Indiana customers "taxable gross income" subject to tax under IND.CODE 6–2.1–2–2(a)(1) or exempt under 45 I.A.C. 1–1–119(1)(d), IND. CODE 6–2.1–3–3, and the Commerce Clause of the United States Constitution?

II. Is the portion of OVEC's gross income received from sales of electricity to Indiana customers derived from "sources within Indiana" and subject to tax under IC 6–2.1–2–2(a)(2) when some of the electricity is generated in Indiana and directly transmitted within Indiana for consumption by Indiana customers?

III. If OVEC's gross income is derived from "sources within Indiana" is it "taxable gross income" under IC 6–2.1–2–2(a)(2) or is it entitled to exemption under IC 6–2.1–3–3 and the Commerce Clause?

IV. Is the imposition of tax barred by the doctrine of waiver, estoppel, legislative acquiescence, or an impermissible change in the Department's interpretation of the tax laws?

### DISCUSSION & DECISION

#### I. IKEC

The Department contends the part of IKEC's gross income that equals the amount of electricity OVEC sells to IM and SIGECO is taxable under IC 6–2.1–2–2(a)(1) and IND.CODE 6–2.1–2–5 [2] because IKEC generates and transmits the electricity in Indiana and the electricity is consumed by Indiana customers. In Indiana, tax is imposed on a resident's gross income pursuant to IC 6–2.1–2–2(a)(1), which provides:

(a) An income tax, known as the gross income tax, is imposed upon the receipt of:

(1) the entire taxable gross income of a taxpayer who is a resident or a domiciliary of Indiana....

A resident electric utility company therefore is subject to tax on the receipt of its entire "gross income" that is "taxable gross income." " 'Taxable gross income' means the remainder of: (1) all gross income which is not exempt from tax under IC 6–2.1–3; less (2) all deductions which are allowed under IC 6–2.1–4." IND.

---

**2.** IC 6–2.1–2–5 does not impose tax, but instead, identifies the rate of taxation for the receipt of income from specific utility transactions, *i.e.*, "producing, transmitting, furnishing, wholesaling, or retailing electrical energy." IC 6–2.1–2–5(1); *see also* IC 6–2.1–2–2(b).

CODE 6–2.1–1–13. Thus, the scope of Indiana's power to impose gross income tax on a resident's entire gross income is not infinite.

The parties do not dispute that the income at issue is "gross income" within the meaning of IND.CODE 6–2.1–1–2; however, IKEC contends the "gross income" the Department seeks to tax is not "taxable gross income" because it is exempt under IC 6–2.1–3–3. IC 6–2.1–3–3, the interstate commerce exemption, defines the outer limits of Indiana's power to exercise its taxing jurisdiction:

Gross income derived from business conducted in commerce between the state of Indiana and either another state or a foreign country is exempt from gross income tax to the extent the state of Indiana is prohibited from taxing that gross income by the United States Constitution.

IC 6–2.1–3–3; *see also Bethlehem Steel,* at 1339, n. 7. The interstate commerce exemption was enacted "[t]o assure that only funds which are subject to a state tax are taxed," and "in recognition of the fact that the dictates of the federal Constitution require that the states of our union exercise certain restraint when acting upon interstate commerce." *Mueller Brass Co. v. Indiana State Dep't of Revenue* (1971), 255 Ind. 514, 533–34, 265 N.E.2d 704, 716, *appeal dismissed,* (1971), 403 U.S. 901, 91 S.Ct. 2206, 29 L.Ed.2d 677.

## REGULATIONS

■ The Department interprets the interstate commerce exemption from gross income tax in regulations 45 I.A.C. 1–1–118 *et seq.* Not all gross income received from transactions in interstate commerce is exempt, only that which the federal Constitution proscribes. 45 I.A.C. 1–1–118. Generally, Indiana's tax regulations prohibit taxation of income derived from sales to out-of-state buyers unless the sales are completed in Indiana. 45 I.A.C. 1–1–119; *see Hoosier Energy Rural Elec. Coop., Inc. v. Indiana Dep't of State Revenue* (1991), Ind., 572 N.E.2d 481, 484 (quoting *Associated Milk Producers, Inc. v. Indiana Dep't of State Revenue* (1989), Ind., 534

N.E.2d 715, 718, *aff'd,* (1991), 572 N.E.2d 481, *cert. denied,* (1991), —— U.S. ——, 112 S.Ct. 337, 116 L.Ed.2d 277).

### 45 I.A.C. 1–1–119(2)(a)

■ The Department asserts IKEC's gross income from the sales at issue are "taxable outshipments" as identified in its regulation:

Sales to nonresidents where the goods become, and are identified as property of the buyer within Indiana and are kept within the State by the seller until they are resold by the buyer and delivered at his direction. See *Department of Treasury v. Globe–Bosse–World Furn. Corp.,* 221 Ind. 201, 46 N.E.2d 830 (1943).

45 I.A.C. 1–1–119(2)(a). The regulation cites the supreme court's decision in *Globe–Bosse* as the illustration of the "taxable outshipment" defined in the regulation. In *Globe–Bosse,* an Indiana furniture manufacturer contracted to manufacture and sell furniture to mail order houses. The mail order houses took title to the furniture upon payment. Thereafter, the manufacturer stored the furniture, now the property of the mail order houses, in its Indiana warehouse until directed to deliver the goods to the railroad for shipment to the out-of-state mail order customers. The supreme court reasoned that the sale transaction was completed entirely in Indiana upon the passage of title, and the mere fact the manufacturer held the goods in its warehouses until the purchaser instructed the goods to be delivered to the railroad for ultimate delivery to customers outside Indiana did not transform the local transaction into an interstate sale.

Here, IKEC contracted to sell all the electricity it generates to OVEC. The electricity does not become the property of OVEC in Indiana, as did the furniture in *Globe–Bosse,* but at the Indiana–Kentucky state line, where title passes as determined by the power agreement. Nor is the electricity stored in Indiana at the direction of OVEC because the electricity cannot be stored. Accordingly, the sale transaction between IKEC and OVEC is an interstate

sale not a local sale as was the sale of furniture in *Globe–Bosse. See also Indiana Dep't of State Revenue v. Chicago Dist. Elec. Generating Corp.* (1956), 236 Ind. 117, 122, 139 N.E.2d 161, 164.

Furthermore, the furniture manufacturer in *Globe–Bosse delivered* the furniture to the railroad complete with address labels to the individual mail order customers. IKEC's *transmission* of electricity at OVEC's direction lacks the directness of the *delivery* in *Globe–Bosse*. Indeed, unlike the furniture manufacturer acting at the behest of the mail order houses, IKEC is incapable of directing the path of electricity from one point to another. The actual route electricity travels within the interconnected grid system, however, follows the laws of physics, and a small amount of IKEC's electricity therefore is instantly present everywhere in the Eastern Interconnection, including the location of OVEC's Indiana customers. Nevertheless, consistent with the reasoning in *Globe–Bosse*, the mere fact that IKEC transmitted a small amount of electricity directly to OVEC's Indiana customers does not transform an interstate sale into a local sale. Consequently, regulation 45 I.A.C. 1–1–119(2)(a) is inapplicable.

### 45 I.A.C. 1–1–119(1)(d)

On the other hand, IKEC claims its sales are "nontaxable out-shipments" described by the Department as:

> Sales of natural gas and electricity to nonresidents where delivery of the product occurs out of the state or at the State line. See *Gross Income Tax Div. v. Chicago Dist. Elec. Generating Corp.*, 236 Ind. 117, 139 N.E.2d 161 (1956).

45 I.A.C. 1–1–119(1)(d). As an illustration of the "nontaxable out-shipments" described in 45 I.A.C. 1–1–119(1)(d), the Department cites the supreme court's decision in *Chicago Dist. Elec.* that held the transmission and sale of electricity delivered at the state line is an interstate transaction, the gross income from which is not properly subject to state taxation under the Commerce Clause. *Chicago Dist. Elec.*, at 122–24, 139 N.E.2d at 164–65. Although properly promulgated regulations have the

force of law, the court will not construe or extend the application of a regulation grounded in case law of doubtful validity. *Hoosier Energy Rural Elec. Coop., Inc. v. Indiana Dep't of State Revenue* (1988), Ind.Tax, 528 N.E.2d 867, 873, *aff'd,* (1991), Ind., 572 N.E.2d 481, *cert. denied,* (1991), —— U.S. ——, 112 S.Ct. 337, 116 L.Ed.2d 277. Regulation 45 I.A.C. 1–1–119(1)(d) cites the supreme court's 1956 interstate commerce decision in *Chicago Dist. Elec.* In the ensuing thirty-six years, however, Commerce Clause jurisprudence has changed profoundly.

Article I, § 8, cl. 3 of the Constitution expressly authorizes Congress to 'regulate Commerce with foreign Nations, and among the several States.' It says nothing about the protection of interstate commerce in the absence of any action by Congress. Nevertheless, as Justice Johnson suggested in his concurring opinion in *Gibbons v. Ogden,* 9 Wheat. 1, 231–232, 239, 6 L.Ed. 23 (1824), the Commerce Clause is more than an affirmative grant of power; it has a negative sweep as well. The clause, in Justice Stone's phrasing, 'by its own force' prohibits certain state actions that interfere with interstate commerce. *South Carolina State Highway Dept. v. Barnwell Bros., Inc.* 303 U.S. 177, 185, 58 S.Ct. 510, 514, 82 L.Ed. 734 (1938).

Our interpretation of the 'negative' or 'dormant' Commerce Clause has evolved substantially over the years, particularly as that clause concerns limitations on state taxation powers. *See generally,* P. Hartman, Federal Limitations on State and Local Taxation §§ 2:9–2:17 (1981). Our early cases, beginning with *Brown v. Maryland,* 12 Wheat. 419, 6 L.Ed. 678 (1827), swept broadly, and in *Leloup v. Port of Mobile,* 127 U.S. 640, 648, 8 S.Ct. 1380, 1384, 32 L.Ed. 311 (1888), we declared that 'no state has the right to lay a tax on interstate commerce in any form.' We later narrowed that rule....

... Most recently, in *Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274, 285, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977), we ... emphasized the importance of looking past 'the formal language of the tax

statute [to] its practical effect,' *Complete Auto,* 430 U.S., at 279, 97 S.Ct., at 1079, and set forth a four-part test that continues to govern the validity of state taxes under the Commerce Clause. *Quill Corp. v. North Dakota* (1992), —— U.S. ——, ——, 112 S.Ct. 1904, 1911–12, 119 L.Ed.2d 91 (footnote omitted).

Our supreme court recently recognized that the *Complete Auto* decision cast doubt upon the precedential value of relatively old decisions that stood "for the proposition that all income derived from interstate sales is exempt from state taxation." *Hoosier Energy,* 572 N.E.2d at 484. In *Complete Auto,* the Supreme Court expressly rejected the view held in earlier interstate commerce decisions "that interstate commerce enjoys a 'free trade' immunity from state taxation." *Goldberg v. Sweet,* (1989), 488 U.S. 252, 259, 109 S.Ct. 582, 587, 102 L.Ed.2d 607, (citing *Complete Auto,* 430 U.S. at 278–79, 97 S.Ct. at 1078–79). The legal effect of *Chicago Dist. Elec.* is therefore questionable because, as will be discussed below, the court relied in part on the precise proposition expressly rejected in *Complete Auto.*

### HEFFERNAN ANALYSIS

In *Indiana Department of State Revenue v. Felix* (1991), Ind., 571 N.E.2d 287, *cert. denied* (1992), —— U.S. ——, 112 S.Ct. 1073, 117 L.Ed.2d 278, our supreme court adopted the seventh circuit's analysis in *Levine v. Heffernan* (7th Cir.1988), 864 F.2d 457, *cert. denied,* (1989), 493 U.S. 873, 110 S.Ct. 204, 107 L.Ed.2d 157 to assess the legal weight of a relatively old decision of the United States Supreme Court within the context of Commerce Clause questions. *Felix,* at 289. The *Heffernan* analysis is based on the premise that only the Supreme Court may overrule one of its own precedents. *Id.* at 289 (citing *Heffernan,* 864 F.2d at 461). Accordingly, lower courts must follow a relevant Supreme Court decision. *Heffernan,* 864 F.2d at 459. Similarly, this court, like all lower courts in Indiana, is bound to follow relevant Indiana Supreme Court precedent. *Cohoon v. Fisher* (1896), 146 Ind. 583, 44 N.E. 664, *reh'g denied,* (1987), 146 Ind. 583, 585–86, 45 N.E. 787, 788; *see also Olson v. Paine, Webber, Jackson & Curtis, Inc.* (7th Cir.1986), 806 F.2d 731, 734; *Harmon v. Bolley* (1918), 187 Ind. 511, 518, 120 N.E. 33, 35, 2 A.L.R. 609, 613 (state courts are bound by decisions of the United States Supreme Court upon the meaning and application of the federal Constitution).

■ Two essential issues relate to a case's precedential effect: (1) whether the decision has been implicitly overruled by subsequent decisions and if not, (2) whether the case is factually distinguishable from the present case. *Felix,* 571 N.E.2d at 289 (quoting *Heffernan,* 864 F.2d at 460). Under a Commerce Clause challenge, the taxability of gross income received from the sale of electricity to a non-resident that was transmitted for delivery, according to an agreement, at the state line was resolved in *Chicago Dist. Elec.* and should control in the case at bar. *Chicago Dist. Elec.* will not control, however, if it has been implicitly overruled by subsequent Indiana Supreme Court or United States Supreme Court decisions or if it is factually distinguishable from the instant case. *See Felix,* 571 N.E.2d at 290, 292.

### IMPLICITLY OVERRULED

■ An old decision is implicitly overruled if it was decided based on an analytical framework that is not valid today or if later cases have invalidated the actual holding. *Id.* at 292. In *Chicago Dist. Elec.,* the supreme court first determined that the sales in question were interstate, not local sales. *Chicago Dist. Elec.,* 236 Ind. at 122, 139 N.E.2d at 164. The court then found the state tax unconstitutional based on the proposition that "[a] tax on gross income from transactions in interstate commerce is an unconstitutional burden upon, or interference with, commerce among the States...." *Id.* at 123, 139 N.E.2d at 164 (citing *Gross Income Tax Div. v. Surface Combustion Corp.* (1953), 232 Ind. 100, 143, 111 N.E.2d 50, *cert. denied,* 346 U.S. 829, 74 S.Ct. 51, 98 L.Ed. 353; *Gross Income Tax Div. v. L.S. Ayres & Co.* (1954), 233 Ind. 194, 118 N.E.2d 480;

*J.D. Adams Mfg. Co. v. Storen* (1938), 304 U.S. 307, 58 S.Ct. 913, 82 L.Ed. 1365, 117 A.L.R. 429; *Freeman v. Hewit* (1947), 329 U.S. 249, 67 S.Ct. 274, 91 L.Ed. 265).

Modern Commerce Clause analysis, articulated in the seminal *Complete Auto* case, recognizes "the view that businesses engaged in interstate commerce may be required to pay their own way." *Goldberg*, 488 U.S. at 259, 109 S.Ct. at 587. The vitality of the *Complete Auto* analysis was reaffirmed by this court in *Hoosier Energy*, 528 N.E.2d at 872, the supreme court in *Hoosier Energy*, 572 N.E.2d at 484, and the United States Supreme Court in *Quill*, at ——, 112 S.Ct. at 1911–12. The threshold issue in *Complete Auto* is identical to that in *Chicago Dist. Elec.*: Is the activity the state seeks to tax an interstate activity? Beyond the threshold inquiry, however, the similarity ends. While a determination that the transaction is interstate automatically led to the conclusion that a gross income tax would unduly burden interstate commerce in *Chicago Dist. Elec.*, *Complete Auto* recognized that a tax does not rise to the level of an impermissible burden on interstate commerce if it reflects a sufficient nexus to the state, a fair apportionment, nondiscrimination between interstate and local commerce, and a relationship between the tax and the services provided by the state. *Hoosier Energy*, 572 N.E.2d at 484 (citing *Associated Milk*, 534 N.E.2d at 718). Thus, the second part of the analysis in *Chicago Dist. Elec.*, holding that state taxation of income derived from the interstate sale of electricity is unconstitutional, was implicitly overruled by the emergence of the new analytical framework in *Complete Auto* and is not good law.

## FACTUALLY DISTINGUISHABLE

Independent of the discredited analysis, however, the supreme court also determined in *Chicago Dist. Elec.* that Indiana's gross income tax is not a tax on the generation of electricity and that the sale of electricity is an interstate transaction. These determinations survive *Complete Auto* and have precedential value if, according to the *Heffernan* analysis, the instant case is not factually distinguishable.

In general, *Chicago Dist. Elec.* and the case at bar are factually similar. In *Chicago Dist. Elec.*, the taxpayer (Chicago Electric) was a resident electric utility corporation, wholly owned by a non-resident corporation (Illinois Edison) and engaged in the production, transmission, and sale of electrical energy. Chicago Electric's entire generating capacity was sold to Illinois Edison and transmitted through directly interconnected lines to three transmission terminals where it commingled with other electricity. Furthermore, the power agreement determined the delivery of the electricity occurred at the Indiana–Illinois state line. Chicago Electric also had a history of similar assessments by the state that, after filing protests, were determined not to be taxable. *Chicago Dist. Elec.*, 236 Ind. at 117, 139 N.E.2d at 162 n. 1. Nevertheless, the instant case includes one distinguishing fact: OVEC resold electricity to Indiana purchasers; no similar fact exists concerning Illinois Edison in *Chicago Dist. Elec.*

If the additional fact in the instant case, the resale of electricity to Indiana purchasers, is a *material* fact, the still viable determinations in *Chicago Dist. Elec.* have no precedential value in the case at bar. *Felix*, 571 N.E.2d at 293. A material fact is a fact that may be dispositive of the litigation or a relevant secondary issue. *C & C Oil Co. v. Indiana Dep't of State Revenue* (1991), Ind.Tax, 570 N.E.2d 1376, 1378 (citing *Willsey v. Peoples Fed. Sav. and Loan Ass'n* (1988), Ind.App., 529 N.E.2d 1199, 1206 n. 5). Furthermore, whether income arises from intrastate or interstate activities is a fact sensitive determination vulnerable to a different disposition upon the addition of a new fact. *See Bethlehem Steel*, at 1337 (citing *Indiana Dep't of State Revenue v. Brown Boveri Corp.* (1982), 439 N.E.2d 561, 564).

 The supreme court's determination that Indiana's gross income tax is not a tax on the generation of electricity would be unaffected even if Illinois Edison had resold electricity to Indiana customers because the determination was a legal, not a

factual, determination. Moreover, the supreme court indicated in *Chicago Dist. Elec.* that the physical properties of electricity and its transmission through an interconnected network, properties the same in 1956 as they are today, were dispositive regarding the interstate nature of the sale of electricity:

> The transmission of electrical energy by appellee to [the] State Line Station is solely for interstate sale and transmission and the [electrical] current, at that time, is not only actually committed to, but is moving in, interstate commerce. The generation and transmission of electrical energy is a continuous and simultaneous operation, and where the transmission for use of the electrical energy is made to points within a State different from the State in which it is generated and produced, such a transaction is made in interstate commerce.

*Chicago Dist. Elec.*, 236 Ind. at 122, 139 N.E.2d at 164. Even if Illinois Edison had resold electricity to Indiana customers, therefore, the basis for the supreme court's findings would remain unchanged. The fact is not potentially dispositive of either issue and therefore is not material. Consequently, the court finds, following the precedent in *Chicago Dist. Elec.*, that the gross income tax is not a tax on the generation of electricity and that IKEC's sales of electricity to OVEC are interstate transactions.

## COMPLETE AUTO ANALYSIS

■ *Complete Auto* "expressly rejected the proposition that interstate commerce is immune from state taxation and set forth a four-part test to be applied to state tax laws which target income derived from out-of-state sales." *Hoosier Energy*, 572 N.E.2d at 484. Thus, a state tax will survive a Commerce Clause challenge if the tax (1) is imposed on an activity with a substantial nexus with the taxing state, (2)

is fairly apportioned, (3) does not discriminate against interstate commerce in favor of local commerce, and (4) is fairly related to services the state provides. *Quill*, at ——, 112 S.Ct. at 1912 (citing *Complete Auto*, 430 U.S. at 279, 97 S.Ct. at 1079).

■ IKEC does not contest that it has a sufficient nexus with Indiana to be taxed, that the Indiana gross income tax does not discriminate against interstate commerce, or that the tax is fairly related to the services Indiana provides to IKEC. The dispute concerns whether the tax is fairly apportioned. To determine whether a tax is fairly apportioned, the court must examine whether it is internally and externally consistent. *Goldberg*, 488 U.S. at 261, 109 S.Ct. at 588, (citing *American Trucking Assoc. v. Scheiner* (1987), 483 U.S. 266, 285, 107 S.Ct. 2829, 97 L.Ed.2d 226; *Armco Inc. v. Hardesty* (1984), 467 U.S. 638, 644, 104 S.Ct. 2620, 2623, 81 L.Ed.2d 540; *Container Corp. v. Franchise Tax Bd.* (1983), 463 U.S. 159, 169–70, 103 S.Ct. 2933, 2942–43, 77 L.Ed.2d 545).

## INTERNALLY CONSISTENT: RISK OF MULTIPLE TAXATION

■ IKEC claims the Department's assessment of tax on its income is internally inconsistent because Ohio could tax the same income, creating a substantial risk of multiple taxation.[3]

To be internally consistent, a tax must be structured so that if every State were to impose an identical tax, no multiple taxation would result. [*Franchise Tax Bd.*, 463 U.S. at 169, 103 S.Ct. at 2942.] Thus, the internal consistency test focuses on the text of the challenged statute and hypothesizes a situation where other States have passed an identical statute. *Goldberg*, 488 U.S. at 261, 109 S.Ct. at 589. "Actual multiple taxation has not been shown, so [IKEC] has the burden of demonstrating that Indiana's taxation scheme

---

**3.** The Department asserts *Hoosier Energy* requires proof that all four prongs of *Complete Auto* could be met by another state to show the risk of multiple taxation. The Petitioners contend, however, that although *Hoosier Energy* looked at several prongs, it did not require this strict showing. Moreover, *Goldberg* required only an examination of the text of a statute to determine whether another state with the same scheme could assess tax. *Goldberg*, 488 U.S. at 261–63, 109 S.Ct. at 589.

poses a *risk* of multiple taxation in a constitutional sense." *Hoosier Energy*, 528 N.E.2d at 872 (emphasis added). A limited possibility of multiple taxation, however, is insufficient to invalidate the state tax. *Goldberg*, 488 U.S. at 263–64, 109 S.Ct. at 590.

If Ohio had a gross income tax statute identical to Indiana's IC 6–2.1–2–2, IKEC, a non-resident, would be subject to Ohio's tax on income from sales to OVEC if the receipts were derived from sources within Ohio. *Cf.* IC 6–2.1–2–2(a)(2). "[I]n ascertaining whether I.C. § 6–2–1–2 [currently IC 6–2.1–2–2] is applicable, the Department must show that *the activities within the State giving rise to the income,* viewed as a whole, are more than minimal." *Indiana Dep't of State Revenue v. General Foods Corp.* (1981), Ind.App., 427 N.E.2d 665, 669–70 (citing *Indiana Dep't of State Revenue v. J.C. Penney Co.* (1980), Ind.App., 412 N.E.2d 1246, *trans. denied; Indiana Dep't of State Revenue v. Convenient Indus. of Am., Inc.* (1973), 157 Ind.App. 179, 299 N.E.2d 641) (emphasis added). Furthermore, if the activities within the taxing state are merely incidental to the total activities giving rise to the income, they are insufficient to seize upon in attempting to impose tax. *General Foods*, 427 N.E.2d at 670.

The fact that IKEC receives income from an Ohio corporation is insufficient to justify imposition of Ohio's hypothetical tax because "to fall within the ambit of I.C. § 6–2–1–2 [currently IC 6–2.1–2–2] 'the derivation of the income must be attributable to *activities* within the State as opposed to the *person* from whom the income is received.' " *Id.* at 670 (quoting *Convenient Indus.*, 157 Ind.App. at 185, 299 N.E.2d at 645); *see also Reynolds Metals Co. v. Indiana Dep't of State Revenue* (1982), Ind.App., 433 N.E.2d 1, 13. Activities related to IKEC's generation of electricity, exclusively Indiana activities, are of little relevance because IKEC's income is derived from the *sale* of electricity not the *generation* of electricity. *Chicago Dist. Elec.*, 236 Ind. at 123, 139 N.E.2d at 164.

Substantial activities, however, are located in Ohio that relate to the *sale* of IKEC's electricity. Many of IKEC's employees work in Ohio. Furthermore, OVEC's load coordinator in Ohio *determined* and *controlled* the amount of electricity IKEC sold to OVEC on a daily, sometimes hourly, basis. Indeed, determining and controlling the amount of electricity IKEC sold were exclusively Ohio activities that cannot reasonably be characterized as remote and incidental to the sales. IKEC's sales related activities located in Ohio therefore are more than minimal and would not fall short of that contemplated by an Ohio gross income tax statute identical to that of Indiana's. Consequently, Ohio could tax IKEC's entire gross receipts from sales to OVEC under the hypothetical Ohio statute, and multiple taxation forbidden by the Commerce Clause could ensue.

The Department claims, however, if "every other state imposed an identical tax upon electricity purchased only by companies residing within their boundaries, no risk of multiple taxation would be created." *REVENUE'S POST-TRIAL BRIEF* at 13. The Department misrepresents its own basis for assessment, that IKEC's income derived from the sale of electricity generated, transmitted, and consumed in Indiana, not that Indiana companies purchased the electricity. Furthermore, the Department has not claimed, nor could they, that IM and SIGECO actually purchased electricity from IKEC. IM and SIGECO purchased electricity from OVEC, a separate and distinct corporate entity. Moreover, IKEC's income was derived from a sale to OVEC; to ignore OVEC's corporate form and claim the income actually came from IM and SIGECO, disregards the long standing rule established by the United States Supreme Court that a corporation is a separate legal entity, distinct from its stockholders (affiliates) for the purposes of taxation.[4] *Moline Properties, Inc. v. Commissioner of Internal Revenue* (1943), 319 U.S. 436, 439, 63 S.Ct. 1132, 1134, 87 L.Ed. 1499; *Department of Treasury v. Crowder* (1938), 214 Ind. 252, 254–55, 15 N.E.2d 89, 91; *Mad-*

---

**4.** The Department does not argue any theory to

induce the court to pierce the corporate veil.

*ding v. Indiana Dep't of State Revenue* (1971), 149 Ind.App. 74, 88, 270 N.E.2d 771, 779.

The Department additionally claims "[i]f every state had the identical tax scheme allowing the assessment of income from electricity *generated* within its boundaries, only one state—Indiana—would have the power to tax the electricity generated by IKEC." *REVENUE'S POST-TRIAL BRIEF* at 13 (emphasis added). The Department misconstrues Indiana's statutory incident of taxation as the "generation of electricity" rather than the "receipt of income." *See Chicago Dist. Elec.,* 236 Ind. at 123, 139 N.E.2d at 164; *see also Gross Income Tax Div. v. P.F. Goodrich Corp.* (1973), 260 Ind. 41, 44–45, 292 N.E.2d 247, 249 (citing Burns § 64–2601 [currently IC 6–2.1–1]; *Mueller Brass,* 255 Ind. 514, 265 N.E.2d 704; *Miles v. Department of Treasury* (1935), 209 Ind. 172, 199 N.E. 372, *appeal dismissed,* (1936), 298 U.S. 640, 56 S.Ct. 750, 80 L.Ed. 1372). Actually, Indiana's tax is not imposed on a resident's generation of electricity in Indiana, if it were, the tax most likely would be measured by kilowatt hours generated, as in West Virginia,[5] not by income received. Accordingly, the court is unpersuaded that Ohio could not tax all IKEC's receipts from its sales to OVEC.

### EXTERNAL INCONSISTENCY: FAIR APPORTIONMENT

Even if the tax assessed on IKEC's sales were not internally inconsistent, IKEC asserts a tax on income derived from the sale of electricity that is generated, transmitted, and consumed in Indiana is not fairly apportioned because it is externally inconsistent. On the other hand, the Department claims the tax is externally consistent because the income from all of IKEC's sales was not assessed, just the portion related to Indiana, the amount generated, transmitted, and consumed in Indiana.

The external inconsistency test is a practical inquiry. *Goldberg,* 488 U.S. at 264, 109 S.Ct. at 619. "The central purpose behind the apportionment requirement is to ensure that each state taxes only its fair share of an interstate transaction." *Id.* at 260–61, 109 S.Ct. at 588. The states have latitude in determining a fairly apportioned taxation scheme because the Constitution does not impose a single apportionment formula on the states. *Id.* at 261, 109 S.Ct. at 588. To determine external inconsistency, the court must ascertain whether the state has taxed only the portion of income from the taxpayer's interstate activities that reasonably reflects the instate element of its activities. *Id.* at 262, 109 S.Ct. at 589.

> As a general proposition, a state tax on interstate commerce must be fairly apportioned to prevent excessive taxes on [the] sale [when] each state takes its bite out of the interstate transaction as it passes through each taxing state. To avoid this unfair impediment to interstate commerce, the Constitution requires that state taxes on interstate commerce be *apportioned according to the relationship of the state to the total transaction.*

*Hoosier Energy,* 572 N.E.2d at 485 (emphasis added).

#### A.

The Department first claims the tax imposed is not externally inconsistent because the Department's method of apportionment is analogous to the Illinois statute held in *Goldberg* to be internally and externally consistent and fairly apportioned. The Illinois statute imposed excise tax on the "gross charge" arising from an interstate telephone call, the critical transaction, that originates or terminates in Illinois *and* is charged to an Illinois service address. *Goldberg,* 488 U.S. at 256, 109 S.Ct. at 586. The incidents of taxation defined in the Illinois statute are all within the scope of the critical transaction: the origination point is the initial event of a call; the termination point completes the geographic boundary of a call, and charging the call to a specific service address occurs within the scope of the call. In addition, the excise statute expressly removes the place where

5. *See* W.VA.CODE § 11–13–2n (1991).

a call is billed or paid from the scope of the critical transaction. *Id.*

In the case at bar, the critical transaction giving rise to the income the Department seeks to tax is IKEC's sale of electricity. A sale is a "contract." *Radebaugh v. Scanlan* (1907), 41 Ind.App. 109, 116, 82 N.E. 544, 547. Indiana's Uniform Commercial Code defines a sale as "the passing of title from the seller to the buyer for a price." IND.CODE 26–1–2–106(1); *see also Snyder v. Stanley* (1922), 77 Ind.App. 253, 261, 133 N.E. 512, 514; *Wayne Pump Co. v. Department of Treasury* (1953), 232 Ind. 147, 155–56, 110 N.E.2d 284, 287.

Generation is not the initial event in a sale of electricity. The initial event in the formation of a contract is an offer. *Interstate Indus., Inc. v. Barclay Indus., Inc.* (7th Cir.1976), 540 F.2d 868, 871. Furthermore, generation of electricity is not indispensable to the sale transaction, as demonstrated by OVEC's sales of electricity generated by IKEC to the DOE and the sponsoring companies. Accordingly, generation is not analogous to the origination of a telephone call because generation is not the initial event of a sale. Indeed, generation may fall completely outside the scope of a sale transaction, as in the instant case, when the seller and the generator are separate entities.

Moreover, neither the transmission nor the consumption of electricity provides the final boundary of the sale. The final boundary is the transfer of title upon the delivery of the "goods."[6] *See* IC 26–1–2–106(1). "[T]he Court must look to the provisions of [IND.CODE] 26–1–2–401 to determine when title passe[s]." *Associated Milk Producers, Inc. v. Indiana Dep't of State Revenue* (1987), Ind.Tax, 512 N.E.2d 917, 919, *aff'd*, (1989), Ind., 534 N.E.2d 715; *Monarch Beverage Co. v. Indiana Dep't of State Revenue* (1992), Ind.Tax, 589 N.E.2d 1209, 1214 n. 13. *"Unless otherwise explicitly agreed,* title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods...." IC

26–1–2–401(2) (emphasis added). OVEC and IKEC *explicitly agreed* in their power agreement that delivery would take place and the title to the electricity would pass at the Indiana–Kentucky state line. Accordingly, transmission and consumption of electricity are not analogous to the termination of a telephone call because neither is the final event of a sale of electricity. Indeed, consumption, like generation, falls outside the sale transaction because, although temporally simultaneous, consumption contractually succeeds transmission and the passage of title. An apportionment scheme based on the generation, transmission, and consumption of electricity therefore is not sufficiently analogous to the taxable incidents in the Illinois excise tax statute for *Goldberg* to be dispositive.

**B.**

Despite the lack of identity between the individual incidents of taxation in *Goldberg* and the case at bar, the Department asserts that an apportionment based on the confluence of activities in a single state is not externally inconsistent under *Goldberg.* The Department's assertion suggests that *Goldberg* stands for the proposition that, as a practical matter, (1) when "insurmountable administrative and technological barriers" make apportioning a tax to "reasonably reflect" the actual in-state activities of an interstate transaction infeasible, (2) a "careful limitation" of the type of interstate transactions the tax reaches is the only realistic solution.

In *Goldberg,* the Supreme Court acknowledged individual incidents, such as electronic signals passing through a state or an interstate call terminating in a state, by themselves, may be insufficient to impose tax. *Goldberg,* 488 U.S. at 263, 109 S.Ct. at 589–90. The Court further noted the technological complexity of an interstate telephone call in which an electronic signal travels from one point to another, often indirectly, through an interconnected network with billions of possible routes that bear no relationship to state bound-

---

**6.** Electricity qualifies as "goods" within the meaning of the UCC. *Helvey v. Wabash County*

*REMC* (1972), 151 Ind.App. 176, 179, 278 N.E.2d 608, 610.

aries and are "virtually impossible to trace and record." *Id.* at 255, 109 S.Ct. at 585. The court concluded that an apportionment formula based on the mileage or some other geographic division of the path the electronic signals traveled in Illinois was not feasible, posing "insurmountable administrative and technological barriers." *Id.* at 264–65, 109 S.Ct. at 590–91. Consequently, the court found the confluence in a single state of either (1) the call's origin with the service address charged *or* (2) the call's termination with the service address charged *and* the statutory credit provision prevented multiple taxation [7] and presented "a realistic legislative solution to the technology of the present-day telecommunications industry." *See id.* at 262–65, 109 S.Ct. at 589–91 (footnote omitted).

The route electricity travels once introduced onto the interconnected grid system, like the path of a telephone call's electronic signal, has no regard for state lines and cannot be traced or directed. A telephone call's signal, however, takes a discrete path, albeit unknown, amongst the billions of possibilities, whereas the laws of physics prove electricity instantaneously travels everywhere within the 240,000 miles of transmission lines commingling with electricity from all 1400 generating plants in the Eastern Interconnection. Indeed, the exact amount of electricity transmitted from a specific location, such as IKEC, that is consumed at another location, such as IM or SIGECO, is unknown, but the expert evidence demonstrated that models approximating these amounts are not infeasible. This court therefore questions whether the technological complexity of the transmission of electricity creates insurmountable administrative barriers, such as those in *Goldberg*, to apportioning a tax to reasonably reflect the in-state activities of an interstate transaction.

Notwithstanding, the Department contends an apportionment based on simultaneous generation, transmission, and consumption of electricity in Indiana is a realistic solution to modern day technology

that passes Constitutional muster under *Goldberg*. The Department's contention suggests that *Goldberg* indicates the standard requiring an apportionment to "reasonably reflect" in-state activities gives way to a less rigorous "careful limitation" fair apportionment standard, forgiving of some multiple taxation and some tax on out-of-state activities, because it is, as a practical matter, a realistic solution to the fair apportionment of modern technology.

On the contrary, the Department's "apportionment formula" is not a realistic solution because it neither "carefully limits" the types of interstate transactions it reaches nor "reasonably reflects" in-state activities related to interstate transactions. First, the Department's assessment, taxing the portion of IKEC's income that equals OVEC's *total* sales to IM and SIGECO, is not carefully limited because it assumes IKEC is the sole source of surplus electricity in direct contradiction to the facts. In reality, however, OVEC's surplus electricity is generated and transmitted by both IKEC and OVEC's Kyger Creek plant in Ohio. Furthermore, the laws of physics prove that electricity transmitted from a specific source is instantaneously present, commingled in small amounts everywhere in the Eastern Interconnection. Thus, at all times the electricity IM and SIGECO consumed included a portion that originated at each of the 1400 interconnected generating plants. Accordingly, the Department's apportionment does not carefully limit its reach, but overreaches, taxing IKEC for electricity generated and transmitted out-of-state.

Moreover, if Indiana taxed the income from interstate sales of electricity by an Indiana utility whenever it generated and transmitted electricity simultaneously with the consumption of electricity by another Indiana utility, privity would be rendered meaningless in the context of electricity sales. In other words, the tax, as the Department would have it apportioned, ignores the contractual parties to a sale and implies a fictitious sale between the

7. Indiana's gross income tax statute does not have a credit provision similar to the Illinois

excise tax statute to ensure that multiple taxation does not occur.

Indiana transmitter and the Indiana consumer. Consequently, Indiana's tax, indifferent to the interstate components of electricity sales, would carelessly extend its reach.

Finally, the Department's apportionment does not "reasonably reflect" the relationship of in-state activities to the total interstate sale. Instead, like trying to force a square peg in a round hole, the Department professes to apportion the tax based on the in-state activities associated with the interstate sale of electricity; while in truth, the Department's apportionment is based on activities, such as generation and consumption, that are beyond the scope of the sale and on activities, like transmission, that overreach into other states and do not even occur within Indiana.

Accordingly, a tax on the income from interstate sales of electricity when the generation, transmission, and consumption simultaneously occur within the state is internally inconsistent because a clear risk of multiple taxation exists and is externally inconsistent because it taxes much more than Indiana's fair share of the electricity generated here that is actually resold here.

■■■ The court therefore finds the portion of IKEC's gross income received from interstate sales of electricity to OVEC that equal OVEC's total sales to IM and SIGECO is entitled to the interstate commerce exemption under IC 6–2.1–3–3 because the tax is internally and externally inconsistent and is therefore not fairly apportioned, failing the second prong of the *Complete Auto* test and offending the Commerce Clause. Furthermore, the court finds regulation 45 I.A.C. 1–1–119(1)(d), although "constitutionally suspect" because it cites a partially superseded decision, is not inconsistent with the *Complete Auto* analysis and is therefore good law until the Department properly promulgates a new fairly apportioned interpretation or the legislature enacts a "realistic solution."

## II. OVEC

■■■ The Department contends OVEC's gross income derived from interstate sales of electricity to IM and SIGECO is taxable under IC 6–2.1–2–2(a)(2) and IC 6–2.1–2–5 [8] because the electricity was generated, transmitted, and consumed in Indiana. A non-resident, such as OVEC, is subject to tax on gross income pursuant to IC 6–2.1–2–2(a)(2), which provides:

(a) An income tax, known as the gross income tax, is imposed upon the receipt of:

. . . .

(2) the taxable gross income derived from activities or businesses or any other sources within Indiana by a taxpayer who is not a resident or a domiciliary of Indiana.

A three-step analysis is required to determine the taxability of a non-resident: (1) are the receipts "gross income," [9] (2) is the gross income derived from "sources within Indiana," and (3) is the gross income that is derived from sources within Indiana "taxable gross income"? [10] IC 6–2.1–2–2(a)(2); *Bethlehem Steel*, at 1329–1330.

■■■ The Department's arguments in this case overlook whether OVEC's income is gross income derived from sources within Indiana under the language of the statute and instead, jump to the issues involving the interstate commerce exemption under IC 6–2.1–3–3 and the Commerce Clause, which would ultimately determine whether the receipts are "taxable gross income." The court's consideration, however, must follow the analytical framework demanded by the imposition statute and well-settled Indiana law, recognizing that " '[c]ourts will not decide Constitutional questions unless such a determination is necessary.' " *Bethlehem Steel*, at 1330 (quoting *J.C. Penney*, 412 N.E.2d at 1252).

The parties do not contest whether OVEC's receipts are "gross income;" therefore, the court's analysis begins by considering whether OVEC's receipts are derived from "sources within Indiana," un-

**8.** *See* n. 1, *supra.*

**9.** IC 6–2.1–1–2.

**10.** IC 6–2.1–1–13.

der IC 6–2.1–2–2(a)(2). As a non-resident taxpayer, OVEC is not taxed on its entire gross income, but only on that portion of its gross income, if any, that is derived from "sources within Indiana." IC 6–2.1–2–2(a)(2). "Judicial construction of 'source' as the incident of taxation has grown-up around the concept of 'business situs.'" *Bethlehem Steel*, at 1333. As used in connection with Indiana's gross income tax, "business situs" is a term of art often used synonymously with "source" under IC 6–2.1–2–2(a)(2). Notwithstanding, confusion surrounds the term "business situs"[11] because it is sometimes used solely to mean the taxpayer has a physical presence in the taxing state or has significant business activities within the taxing state, and other times "business situs" is used to mean "tax situs."[12] The terms are distinguished, however, principally when a taxpayer has more than one "business situs." Both the Department's regulations and Indiana case law suggest, however, that a "tax situs," not a "business situs," is the alter ego of "source."

The Department's regulations, interpreting the interstate commerce exemption from gross income tax, incorporate the concept of "business situs." *See* 45 I.A.C. 1–1–118 *et seq.* "Business situs" is defined in regulation 45 I.A.C. 1–1–49 by examples describing ways a taxpayer may establish a "business situs" in Indiana. Although the list is not exhaustive, the examples equate either a physical presence in Indiana or the performance of certain business activities in Indiana with the establishment of a "business situs." Regulation 45 I.A.C. 1–1–120, however, reveals that not every "business situs" is considered a "tax situs" or "source" in Indiana:

> As a general rule, income derived from sales made by nonresident sellers to Indiana buyers is not subject to gross income tax unless the seller was *engaged in business activity within the State* [*i.e.*, business situs] *and such activity was connected with or facilitated the sales* [*i.e.*, tax situs]. Local activity sufficient to subject the seller to taxation may result from his maintenance of a fixed business location in Indiana, or may result from the nature and extent of his business activities in the State....

45 I.A.C. 1–1–120 (emphasis added). The regulation also contains examples of both "nontaxable in-shipments"[13] and "taxable in-shipments," all of which require a determination of whether the non-resident has an Indiana "business situs" that is the "tax situs" or "source" of the income for purposes of taxation. Consequently, the regulations teach that a non-resident is subject to taxation, if the "source" of the gross income is an Indiana "tax situs," *i.e.*, an Indiana "business situs" at which business activities are performed that are connected with or facilitate the transactions (sales) giving rise to the "gross income." 45 I.A.C. 1–1–120.

The few cases interpreting the "source" language of IC 6–2.1–2–2(a)(2) are predicated upon the same analysis. *See General Foods*, 427 N.E.2d at 669–70 ("the activities within the State giving rise to the income,

---

**11.** Much of the confusion stems from the "quagmire" of federal decisions involving the Commerce Clause and, similarly, Indiana decisions applying the federal law, both of which are beyond the scope of the instant inquiry. *See Quill*, at ——, 112 S.Ct. at 1915, 82 L.Ed.2d at 108.

**12.** In *Bethlehem Steel*, the "business situs" of an intangible is synonymous with its "tax situs," as the analysis suggests. *Bethlehem Steel*, at 1334.

**13.** OVEC asserts its gross income from sales to IM and SIGECO are "nontaxable in-shipments" identified as "[s]ales made by nonresidents with no *instate business situs* nor *local business activities*, and the goods are shipped directly to the buyer upon receipt of a prior order." 45 I.A.C. 1–1–120(1)(a) (emphasis added). OVEC does

not have a physical presence in Indiana, and the few business activities OVEC has within Indiana are insufficient under 45 I.A.C. 1–1–49 to establish a "business situs." OVEC, however, has some local business activities, receiving and sending teletype communications to SIGECO and computer communication with IKEC. Nonetheless, the court is unconvinced that 45 I.A.C. 1–1–120(1)(a) is applicable because electricity is incapable of being "shipped directly." Moreover, although the regulation provides a list of non-taxable and taxable in-shipments, tax is assessed based on whether income has an Indiana source under IC 6–2.1–2–2(a)(2), not on equating with one of the examples in the regulation.

viewed as a whole, are more than minimal"); *J.C. Penney*, 412 N.E.2d at 1251 ("the local activities with respect to the credit service income were remote and incidental"); *Convenient Indus.*, 157 Ind.App. at 188–89, 299 N.E.2d at 647 (minimal activities occurred in Indiana with respect to the income derived from service and advertising fees); *cf. Miami Coal Co. v. Fox* (1931), 203 Ind. 99, 113, 176 N.E. 11, 17 (intangible not subject to property tax because activities generating the intangible did not occur at the Indiana "business situs"); *Bethlehem Steel*, at 1337 (income from sale of intangible not subject to tax because the activities within Indiana related to the sale fell far short of the degree of activity contemplated by the gross income tax statute). In all of these cases, Indiana law not only requires the activities to be related to the transaction giving rise to the income, when viewed as a whole, but also suggests the activities must be weighed to determine if they are more than minimal and not remote or incidental to the total transaction. *Bethlehem Steel*, at 1337 (the court must "weigh[ ] the degree of related activity at a 'business situs' to determine if it is more than minimal and not remote or incidental to the transaction giving rise to the income"). Accordingly, to determine whether income is derived from an Indiana "source," the "tax situs," the court must (1) isolate the transaction giving rise to the income, the critical transaction, (2) determine whether OVEC has a physical presence in the taxing state or has significant business activities within the taxing state, a "business situs," and (3) determine whether the Indiana activities are related to the critical transaction and are more than minimal, not remote or incidental to the total transaction, the "tax situs."

The Department asserts OVEC's income from interstate sales of electricity to IM and SIGECO is derived from an Indiana source because the electricity is generated, transmitted, and consumed in Indiana. The critical transaction is OVEC's sale of electricity to IM and SIGECO. The court therefore must determine whether OVEC has an Indiana "business situs" and if so, whether the Indiana "business situs" is also the "tax situs."

OVEC does not have a physical presence in Indiana; it owns no property, has no office, has no employees, and has no inventory (electricity cannot be stored) in the state. To sell electricity to IM or SIGECO, OVEC communicates by teletype to determine the amount each will purchase. All the teletype communications concerning sales and purchases between OVEC and IM take place between OVEC's Piketon, Ohio office and the AEP system control center in Columbus, Ohio. OVEC's teletype communications with SIGECO, however, take place between Piketon and SIGECO's Indiana plant. OVEC also communicates the amount it will purchase daily from IKEC and controls the amount of electricity IKEC generates to exactly equal OVEC's demand, sometimes on an hourly basis, by a computer signal sent from OVEC's Ohio computers to the computers at IKEC in Indiana. The only business activities OVEC has within Indiana therefore are teletype communications with SIGECO and computer communications with IKEC.[14] These activities are not identical to the explicit examples under 45 I.A.C. 1–1–49 nor are they sufficiently analogous to the examples to mandate a finding that OVEC has an Indiana "business situs." Nonetheless, OVEC has local business activities, notably the computer control of IKEC's generation, that may support a determination that OVEC has an Indiana "business situs."

The decisive inquiry to determine if OVEC's income was derived from sources within Indiana requires the court to examine whether OVEC's Indiana activities are related to the critical transaction and are

---

**14.** As noted in *Goldberg*, the fact that a telephone call's electronic signals pass through a state is not enough to establish nexus. *Goldberg* 488 U.S. at 263, 109 S.Ct. at 589. Similarly, OVEC's electricity passes into Indiana, but is not sufficient to establish nexus. These contacts are analogous to mail or telephone communications which are insufficient as nexus. *See Nat'l Bellas Hess, Inc. v. Department of Revenue* (1967), 386 U.S. 753, 87 S.Ct. 1389, 18 L.Ed.2d 505; *Quill*, at ——, 112 S.Ct. at 1904, 119 L.Ed.2d 91.

more than minimal, not remote or incidental to the total transaction. The Department contends the activities connecting OVEC's income to Indiana are the generation, transmission, and consumption in Indiana of the electricity sold.

At the outset, however, the court notes that the Department attempts to impute the Indiana activities of IKEC to OVEC. Admittedly, IKEC is the wholly owned subsidiary of OVEC; however, each is a separate corporate entity formed for business purposes in different states. As stated previously, courts have long recognized that a corporation is a separate legal entity, distinct from its stockholders for the purposes of taxation. The Department, however, does not argue any legal theory upon which the court might penetrate the corporate form for purposes of taxing OVEC for the acts of IKEC.

The Department first asserts that OVEC's control over the generation of electricity in Indiana that is sold is an act connecting OVEC's income to Indiana. Even if IKEC's generation was thus imputed to OVEC, as discussed previously, the generation of the electricity falls outside the scope of the critical transaction, the sale of electricity. As shown by OVEC's sale, the same entity need not generate the electricity it sells. Indeed, the electricity generated is the subject of two separate sale transactions; its generation falling within the scope of the transaction between IKEC and OVEC, but outside the scope of the sale between OVEC and IM and SIGECO. Moreover, just as the location of property underlying intangible tax benefits was outside the transaction involving the sale of the intangible in *Bethlehem Steel,* so is the generation of electricity outside the transaction involving its sale by OVEC to IM and SIGECO. Accordingly, the generation of electricity in Indiana is remote and incidental to the critical transaction and does not establish that OVEC's income is from an Indiana "source" or "tax situs."

Second, the Department contends IKEC's transmission, at OVEC's direction, of electricity OVEC sold to IM and SIGECO was an act connecting OVEC's income to an Indiana source. The Department claims that some of the electricity OVEC sold to IM and SIGECO travels directly to them from IKEC without ever entering Ohio. " 'The activities contemplated by the statute [IC 6–2.1–2–2] must be more than minimal' " to support the imposition of tax. *J.C. Penney,* 412 N.E.2d at 1248 (quoting *Convenient Indus.,* 157 Ind.App. at 185, 299 N.E.2d at 645). Transmission of electricity is clearly within the sale transaction, and the expert testimony supports the Department's claim that some electricity generated at IKEC travels completely within Indiana to IM and SIGECO. Nonetheless, this is true whether the electricity is sold to IM and SIGECO, to one of the out-of-state sponsoring companies, or to the DOE. The path of IKEC's electricity transmitted within the interconnected grid system cannot be directed from the point of generation to the point of consumption, its path determined by the laws of physics. Accordingly, the interstate character of electricity transmission is unquestionable. The court is unpersuaded that IKEC's direct transmission of small amounts of electricity to IM and SIGECO, indifferent to the sale transaction to which IKEC is contractually related, is sufficiently related to the critical sale transaction or is more than minimal in comparison to the interstate nature of the transaction. The court therefore finds IKEC's direct transmission of small amounts of electricity to IM and SIGECO falls far below the degree of Indiana activity contemplated by the Indiana gross income tax statute and is remote and incidental to the interstate sale.

Finally, the Department contends that the consumption of electricity by Indiana consumers is an activity tying OVEC's income to an Indiana source or "tax situs." The Department's own regulation contradicts this assertion. The general rule in Indiana is that income from sales by an out-of-state seller to a buyer in Indiana are not subject to Indiana's gross income tax without something more to connect the non-resident to our state. 45 I.A.C. 1–1–120. The court agrees with the regulation. Accordingly, the court finds the income OVEC received from its sales of electricity

to IM and SIGECO was not derived from "sources within Indiana" under IC 6–2.1–2–2(a)(2) and does not have an Indiana "tax situs."

The Department is entrusted with the profound responsibility of interpreting and enforcing certain of our tax laws. The complexity of determining the source of income under Indiana law is sometimes daunting, as is determining whether an Indiana tax will impermissibly burden interstate commerce and offend the Commerce Clause. Nevertheless, the court is disturbed that the Department admittedly assessed IKEC and OVEC on the identical transaction because " 'someone owes the tax on those sales.' And with no one knowing where, who the electricity belongs to, the auditor took the safe way out and assessed both companies." *Trial Record* at 168.

Moreover, the court recognizes that the ever increasing demands upon public funds motivate states to search for new sources of revenue. Indeed, states, tempted by fruit harvested by non-resident corporations engaged in commerce that touches many states, frequently ask the courts, as the Department has in this case, to give them "a piece of the pie." [15] *Oral Argument Record* at 17. Regrettably, however, the courts legitimately may only serve just desserts.

The court finds, based on the above reasoning, that Indiana law does not authorize the imposition of gross income tax on OVEC's income from interstate sales to IM and SIGECO. As a result of its decision, the court does not reach the questions of whether OVEC's gross income is "taxable gross income" under IC 6–2.1–1–13, is exempt under the interstate commerce exemption pursuant to IC 6–2.1–3–3, and is taxable without offending the Commerce Clause of the United States Constitution.

---

**15.** For the years at issue, IKEC and OVEC have paid Indiana gross income tax in excess of $1.2 million, calculated on OVEC and IKEC as a unitary business, and paid by IKEC.