CHIEF INDUSTRIES, INC., Petitioner,

v.

INDIANA DEPARTMENT OF State
REVENUE, Respondent.

No. 49T10–9711–TA–193.

Tax Court of Indiana.

Oct. 24, 2000.

Publication Order July 29, 2003.

Annette T. Brogden, Starkey & Brogden, Indianapolis, IN, Jeffrey L. Ungerer, Newbery & Ungerer, Topeka, KS, Attorneys for Petitioner.

Karen M. Freeman–Wilson, Attorney General of Indiana, Vincent S. Mirkov, Deputy Attorney General, Indianapolis, IN, Attorneys for Respondent.

FISHER, J.

Petitioner Chief Industries, Inc. (Chief) appeals the final determination of the Indiana Department of State Revenue (Department) denying Chief's request for a refund of adjusted gross income taxes paid by Chief on certain capital gains income for the tax year ending June 26, 1987 (tax year). In this original tax appeal, Chief claims that these capital gains do not constitute apportionable business income subject to Indiana's adjusted gross income tax. Chief raises several arguments supporting its position; however, the Court considers the following issue dispositive: whether certain capital gains realized by Chief that were generated by Chief's sales of common stock of a non-domiciliary corporation constitute adjusted gross income derived from a source within Indiana.[1]

### FACTS AND PROCEDURAL HISTORY

The relevant facts in this appeal are not in dispute.[2] Chief was incorporat-

---

1. The Court does not reach the primary issue contested by the parties: whether the capital gains realized by Chief constituted business or nonbusiness income, *see infra* n. 5.

2. The facts are primarily drawn from the Affidavit of Robert G. Eihusen, filed by Chief on June 15, 1998. INDIANA T.R. 56(E) states that affidavits supporting or opposing summary

ed in Delaware in 1959 and remains a Delaware corporation. Chief's commercial domicile has at all times during its corporate existence been located in Grand Island, Nebraska. The company has been engaged in the business of manufacturing and wholesaling, among other things, engineered metal products, commercial steel buildings, agricultural grain bins and drying equipment, mobile homes, recreational vehicles, electronic signs and waste-water treatment systems.

Since the early 1970s, Chief has operated a manufacturing facility in Rensselaer, Indiana (Rensselaer facility). The Rensselaer facility was initially part of Chief's agricultural division. It has since been converted to manufacture pre-engineered, metal commercial buildings. Operations at the Rensselaer facility constitute Chief's exclusive manufacturing activities within Indiana.

From 1972 until May 31, 1984, Chief segregated certain assets into what it referred to as its "automotive division." On May 31, 1984, the automotive division was incorporated in Delaware as Chief Automotive Systems, Inc. (Automotive).[3] At all times during its commercial existence, Automotive's commercial domicile, principal corporate offices, and management and direction staff have also been located in Grand Island, Nebraska. The automotive division had manufactured and marketed a patented vehicle collision repair and realignment system; Automotive assumed this same role.

On August 10, 1984, Automotive issued 1,150,000 shares of its previously un-issued common stock in an initial public offering. All proceeds from the offering went to Automotive. During the tax year, Chief made two sales of Automotive common stock: 100,000 shares on July 1, 1986 and 2,645,000 shares on December 1, 1986.[4]

For purposes of determining its Indiana adjusted gross income tax liability, Chief reported its capital gains from sales of its shares of Automotive common stock dur-

judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." *See National al Ass'n of Miniature Enthusiasts v. State Bd. of Tax Comm'rs*, 671 N.E.2d 218, 220 n. 2 (Ind. Tax Ct.1996) (reciting same standard). "An affidavit which does not satisfy the requirements of T.R. 56(E) is subject to a motion to strike, and a defect is waived in the absence of a motion to strike or other objection." *American Management, Inc. v. MIF Realty, L.P.*, 666 N.E.2d 424, 429 n. 2 (Ind.Ct. App.1996). In his eight-page affidavit, Eihusen neither states that his declarations are made on personal knowledge nor explains the basis for his statements, e.g., whether he is an employee or an officer of the company. However, because the Department did not object to or move to strike the affidavit (and, in fact, relies upon the affidavit in its response brief), the Court finds that any defects in the affidavit have been waived.

3. Chief owned 100% of Automotive's 2,500,000 shares of common stock at the time the company was incorporated.

4. Chief indicates that, from August 10, 1984 to May 17, 1985, it owned 68.5% of Automotive's outstanding common stock. On May 18, 1985, Chief sold 1,100,00 shares of its Automotive common stock, reducing its ownership interest to 1,400,000 shares or 38.3% of the outstanding common stock. According to a chart provided by Chief, a three-for-two stock split occurred on March 7, 1986, increasing Chief's total number of shares to 2,100,000 while keeping its ownership percentage at 38.3%. After the sale of 100,000 shares on July 1, 1986, Chief owned 2,000,000 or 37.9% of Automotive common stock. Another three-for-two stock split took place on November 3, 1986, giving Chief ownership of 3,000,000 shares of Automotive common stock. Chief's percentage of common stock remained 37.9%. Finally, following its sale of stock on December 1, 1986, Chief owned 355,000 shares of Automotive common stock, reducing to 4.3% its ownership percentage.

ing the tax year as nonbusiness income allocable to its commercial domicile, Nebraska. Following an audit, the Department issued Chief a proposed adjusted gross income tax assessment for the tax year of $53,390 plus interest. The proposed assessment resulted from the Department's reclassification of the capital gains generated by sales of Automotive common stock from nonbusiness to business income.[5]

Chief protested this assessment. The Department conducted a telephonic hearing on the protest on October 1, 1991. On April 22, 1992, the Department issued a Letter of Finding denying Chief's protest. Chief requested a rehearing on its protest on May 6, 1992, but the request was denied on May 13, 1992. On or about June 3, 1992, Chief paid the Department $76,950.35 ($53,390.00 tax plus $23,560.35 interest) for the tax year. It filed a refund claim on November 23, 1994, requesting reimbursement of the total tax and interest paid for the tax year plus statutory interest due from the date of payment.

■ The Department did not respond to Chief's refund claim, so Chief filed an orig-

inal tax appeal with this Court on November 20, 1997.[6] Chief filed a motion for summary judgment, together with a brief in support thereof, on June 15, 1998. The Department filed a response brief on August 21, 1998.[7] Chief responded with a reply brief on September 30, 1998. The Court conducted a hearing on the summary judgment motion on November 17, 1998. Additional facts will be supplied as needed.

## ANALYSIS AND OPINION

### Standard of Review

■ This Court hears the appeal of a taxpayer's refund claim de novo and is bound by neither the evidence presented nor the issues raised below. *See* IND.CODE ANN. § 6–8.1–9–1(d) (West 2000); *Mynsberge v. Department of State Revenue*, 716 N.E.2d 629, 631 (Ind. Tax Ct.1999). Summary judgment is only appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* IND. T.R. 56(C); *Mynsberge*, 716 N.E.2d at 631. Cross motions for summary judgment do

---

5. "Business income" is defined as "income arising from transactions and activity in the regular course of the taxpayer's trade or business and includes income from tangible and intangible property if the acquisition, management, and disposition of the property constitutes integral parts of the taxpayer's regular trade or business." IND.CODE ANN. § 6–3–1–20 (West 2000). "Nonbusiness income" means "all income other than business income." IND.CODE ANN. § 6–3–1–21 (West 2000).

6. Normally, this Court lacks subject matter jurisdiction to consider appeals in cases where the Department has not issued a final determination. *See* IND.CODE ANN. § 33–3–5–2(a)(1) (West 1996). However, the General Assembly provides an exception to this requirement in refund appeal suits. INDIANA CODE ANN. § 6–8.1–9–1(c) (West 2000) "confers jurisdiction on this Court to hear an appeal when the taxpayer has waited at least

181 days (and less than three years) but has received no determination from the Department regarding his claim for refund...." *City Sec. Corp. v. Department of State Revenue*, 704 N.E.2d 1122, 1125 (Ind. Tax Ct.1998). Because Chief filed the present appeal more than 181 days but less than three years after filing its refund claim with the Department, the Court has subject matter jurisdiction to consider this original tax appeal.

7. Although not captioned as a cross motion for summary judgment, the Department's response brief requests that summary judgment be entered in its favor. Pursuant to IND. T.R. 56(B), summary judgment may be granted to the non-moving party. Therefore, the Court will treat the Department's request as a cross motion for summary judgment. *See Hunt Corp. v. Department of State Revenue*, 709 N.E.2d 766, 767 n. 5 (Ind. Tax Ct.1999).

not alter this standard. *See Mynsberge,* 716 N.E.2d at 631. Questions of statutory interpretation are particularly amenable to resolution by summary judgment. *See id.*

## Discussion

Chief asserts that the capital gains it received from sales of Automotive common stock are not subject to Indiana's adjusted gross income tax.[8] During the tax year at issue, Indiana imposed a "tax at the rate of three percent [3%] of adjusted gross income ... on that part of the adjusted gross income derived from sources within the state of Indiana of every corporation." IND.CODE ANN. § 6–3–2–1(b) (Michie Supp. 1986).[9] With regard to corporations, the General Assembly further defined "adjusted gross income derived from sources within the state of Indiana" in relevant part as:

(1) Income from real or tangible personal property located in this state;

(2) Income from doing business in this state;

(3) Income from a trade or profession conducted in this state;

(4) Compensation for labor or services rendered within this state; and

(5) Income from stocks, bonds, notes, ... and other intangible personal property having a situs in this state.

IND.CODE ANN. § 6–3–2–2(a) (Michie Supp. 1986).[10] Section 6–3–2–2(a) further explains that only nonbusiness income allocated to Indiana under subsections (h)-(k)

and only business income apportioned to Indiana pursuant to subsection (b) shall be deemed to be derived from sources within the state of Indiana.

 The Court may construe and interpret a statute only if it is unclear and ambiguous. *See Shoup Buses, Inc. v. Indiana Dep't of State Revenue,* 635 N.E.2d 1165, 1167 (Ind. Tax Ct.1994). In construing a statute, the Court strives to determine and give effect to the General Assembly's intent. *See id.* at 1168. In general, the best evidence of this intent is found in the language chosen by the General Assembly. *See Mynsberge,* 716 N.E.2d at 632. Words and phrases in a statute are to be given their plain, ordinary, and usual meaning. *See Uniden Am. Corp. v. Dep't of State Revenue,* 718 N.E.2d 821, 824 (Ind. Tax Ct.1999). Statutes are to be construed in the context of the whole act of which they are a part, giving effect, if possible, to each word and clause. *See Sangralea Boys Fund, Inc. v. State Bd. of Tax Comm'rs,* 686 N.E.2d 954, 958 (Ind. Tax Ct.1997), *review denied.* The Court endeavors to construe statutes so as to prevent absurd results. *See Uniden,* 718 N.E.2d at 828. Finally, a tax imposition statute, such as the adjusted gross income tax, is to be strictly construed against the imposition of the tax. *See Mynsberge,* 716 N.E.2d at 633.

To be subject to Indiana's adjusted gross income tax, the capital gains generated by Chief's sales of Automotive com-

---

**8.** "Adjusted gross income," as regards corporations, means the same as "taxable income" (as that term is defined by 26 U.S.C. § 63), with certain modifications. *See* IND.CODE ANN. § 6–3–1–3.5(b) (Michie Supp.1986) (subsequently amended).

**9.** Effective July 1, 1987, the rate of tax increased from three percent to three and four-tenths percent. *See* P.L. 390–1987(ss), § 37; IND.CODE ANN. § 6–3–2–1(b) (West 2000).

**10.** The current version of section 6–3–2–2(a)(5) omits the phrase "having a situs in this state" and replaces it with "if the receipt from the intangible is attributable to Indiana under section 2.2 of this chapter." INDIANA CODE ANN. § 6–3–2–2.2 (West 2000), effective January 1, 1990, discusses when income from, among other things, certain loans, sales contracts and dividends is attributable to Indiana.

mon stock must have been classified as income derived from sources within the state of Indiana; this classification must have been made prior to deciding whether the income was business or nonbusiness income. Section 6–3–2–2(a) identifies the various Indiana sources from which adjusted gross income may be derived. Subsection (5) includes income from "stocks, bonds, notes ... and other intangible personal property having a situs in this state." At first blush, this provision can be reasonably interpreted two ways. The clause "having a situs in this state" may be read to modify only the term "other intangible personal property" or to modify each item of intangible personal property within subsection five, i.e., stocks, bonds, notes, etc. Thus, section 6–3–2–2(a)(5) is unclear and ambiguous.

■ The Court finds that the latter interpretation is the most logical. The Adjusted Gross Income Tax Act of 1963 (the Act), *see* IND.CODE ANN. § 6–3–1–1 (Michie 1984) (amended 1988), is an apportioned tax designed to reach income from interstate transactions. *See Indiana Dep't of State Revenue v. Bethlehem Steel Corp.*, 639 N.E.2d 264, 266 n. 4 (Ind.1994). As our Supreme Court has noted, in passing the Act the General Assembly reacted to its recognition that "Indiana was losing revenue because the U.S. Supreme Court had declared that Indiana's unapportioned gross income tax could not constitutionally reach proceeds from interstate commerce." *Id.* (citations omitted). As the Supreme Court further observed, "Presently, the gross income tax and the adjusted gross income tax form a single tax scheme, under which corporations are given a credit on their adjusted gross income tax liability for gross income taxes paid." *Id.* (citing IND.CODE § 6–3–3–2 (1989)). Thus, the legislature's intent in passing the Act was to tax those portions of interstate transac-

tions specifically apportioned to Indiana that may otherwise escape taxation under Indiana's gross income tax provisions.

■ The General Assembly's intent is manifested in the language used in section 6–3–2–2(a). A plain reading of subsections (1)-(4) indicates that the General Assembly considered Indiana source income to be income derived from income-producing activities undertaken, performed, or conducted either "in this state" or "within this state." These phrases clearly modify each item referenced within each subsection. For example, in subsection (1), the phrase "located in this state" modifies both "real" property and "tangible personal" property. Likewise, in subsection (4), the phrase "rendered within this state" modifies both compensation for "labor" and compensation for "services." To be consistent throughout section 6–3–2–2, the pattern must be read to extend to subsection (5). It would be absurd to read subsection (5) differently than the immediately preceding four subsections. Therefore, the Court finds that, to be considered income from a source within Indiana under section 6–3–2–2(a)(5), the income must be generated by stocks having a situs in Indiana.

■ The Court has never determined whether intangible personal property has an Indiana source or tax situs as regards the adjusted gross income tax. However, the Court has considered the issue in the context of Indiana gross income tax. *See* IND.CODE ANN. §§ 6–2.1–1–2 & –2–2 (West 2000) (defining and imposing gross income tax). Section 6–2.1–2–2(a)(2) imposes the gross income tax upon the receipt of the "taxable gross income derived from activities or businesses or any other sources within Indiana by a taxpayer who is not a resident or a domiciliary of Indiana." As noted *supra*, the gross income and adjusted gross income provisions form a single tax scheme. *But cf. Associated Ins. Cos.*

*v. Indiana Dep't of State Revenue*, 655 N.E.2d 1271, 1276 (Ind. Tax Ct.1995) ("The court is not convinced, however, that the adjusted gross consolidated filing statute provides any clear insight into the meaning of the gross income consolidated filing statute."), *review denied.* The Court finds no reason to treat a determination of tax situs under the two taxes differently. The Court has previously applied a three-part test to determine the tax situs of intangible personal property. *See Indiana–Kentucky Elec. Corp. v. Indiana Dep't of State Revenue*, 598 N.E.2d 647, 664–65 (Ind. Tax Ct.1992) (finding that Ohio corporation was not subject to imposition of gross income tax for its sales of electricity to Indiana customers, where Ohio corporation had no tax situs within Indiana). *See also First Nat'l Leasing and Fin. Corp. v. Indiana Dep't of State Revenue*, 598 N.E.2d 640, 643–45 (Ind. Tax Ct.1992) (determining that non-domiciliary corporation's ownership of equipment located in Indiana was remote and incidental to critical transaction, i.e., lease of the equipment to the corporation's wholly owned subsidiary); *Uniden*, 718 N.E.2d at 828 (noting that Court would likely have applied three-part test to IND.CODE ANN. § 6–2.1–1–2(c)(6) (West 2000) [defining in part what definition of gross income does not include] if Court had read the term "sources" into statute). *Cf. Bethlehem Steel Corp.*, 639 N.E.2d at 268 (stating that Supreme Court "generally approve[s]" of the Tax Court's reading and application of section 6–2.1–2–2(a), in a case dealing with application of gross income statute to sale of federal tax benefits). The three-part test is as follows:

> [T]o determine whether income is derived from an Indiana "source," the "tax situs," the court must (1) isolate the transaction giving rise to the income, the critical transaction, (2) determine whether [the out-of-state taxpayer] has a physical presence in the taxing state or has significant business activities within the taxing state, a "business situs" and (3) determine whether the Indiana activities are related to the critical transaction and are more than minimal, not remote or incidental to the total transaction, the "tax situs."

*Indiana–Kentucky Elec.*, 598 N.E.2d at 663.

■ Applying this test to the present facts, the Court finds that the Automotive common stock at issue lacked an Indiana tax situs. The critical transactions are easily identified; they were the two sales of Automotive common stock—the first (100,000 shares) on July 1, 1986 and the second (2,645,000 shares) on December 1, 1986. In addition, Chief does have a business situs in Indiana; it owns a facility in Rensselaer that manufactures pre-engineered, metal commercial buildings.

The third step requires a weighing of the undisputed facts. Upon doing so, the Court finds that Chief's activities at its Indiana business situs during the tax year were unrelated to the sales of Automotive common stock. During the tax year, Chief did not engage in the active trading of stocks or bonds as a trade or business. The sales of Automotive common stock were not transactions or activities conducted in the regular course of Chief's trade or business. All activities and decisions pertaining to and surrounding Chief's sales of Automotive common stock did not take place in Indiana; rather, these decisions were made by Chief's Executive Committee located in Grand Island, Nebraska. No person at the Rensselaer facility either had the ability to or actually did influence Chief's decisions to sell its shares of Automotive common stock. Sale of the common stock did not affect the day-to-day operations of the Rensselaer facility, and the facility did not directly benefit from

the proceeds of the sales of the common stock. In short, there is no relationship between the Rensselaer facility and Chief's sales of its shares of Automotive common stock. Based on these facts, the Court determines that the critical transaction in question had, if any, only a minimal relationship to the operations carried on by Chief at the Rensselaer facility. Any connection between the critical transaction and the Rensselaer facility's activities was at best remote. *See Indiana–Kentucky Elec.*, 598 N.E.2d at 664 (finding generation of electricity in Indiana to be remote and incidental to critical transaction).

As a matter of law, the Court finds that the capital gains earned by Chief from its sales of Automotive common stock during the tax had no tax situs in Indiana. Therefore, income from the stock sales is not "derived from sources within the state of Indiana" per section 6–3–2–2(a)(5). Lacking an Indiana source, the capital gains in question cannot be subjected to Indiana's adjusted gross income tax, as imposed by section 6–3–2–1(b).

## CONCLUSION

For the aforementioned reasons, the Court hereby GRANTS Chief's motion for summary judgment and DENIES the Department's cross motion for summary judgment. The Court ORDERS the Department to refund Chief the amount of tax and interest assessed and paid during the tax year in the amount of $76,950.35, plus statutory interest.

## *ORDER*

The Petitioners, Jasper Engine Exchange, Inc., *et. al.*, have filed their "Motion for Publication of Opinion Issued in Cause No. 49T10–9711–TA-193."

More than ten (10) days has elapsed since said motion was filed and no objection to same has been filed by the Respondent.

The Court, having considered same and being duly advised in the premises, now finds said motion should be GRANTED and that this Court's decision in *Chief Industries, Inc. v. Indiana Department of State Revenue*, Cause No. 49T10–TA–193 should now be ordered published.

IT IS THEREFORE ORDERED as follows:

1. Petitioners' "Motion for Publication of Opinion Issued in Cause No. 49T10–9711–TA–193" is granted and this Court's decision heretofore handed down in *Chief Industries, Inc. v. Indiana Department of State Revenue*, Cause No. 49T10–9711–TA–193 on October 24, 2000, marked "Not For Publication" is now ordered published.