ATTORNEYS FOR PETIONER:
**STEPHEN H. PAUL**
**FRANCINA A. DLOUHY**
**BENJAMIN A. BLAIR**
FAEGRE BAKER DANIELS LLP
Indianapolis, IN

ATTORNEYS FOR RESPONDENT:
**GREGORY F. ZOELLER**
ATTORNEY GENERAL OF INDIANA
**JOHN P. LOWREY**
DEPUTY ATTORNEY GENERAL
Indianapolis, IN

# IN THE
# INDIANA TAX COURT

**FILED**
Jun 03 2015, 11:44 am

**CLERK**
of the supreme court,
court of appeals and
tax court

| | |
|---|---|
| PINNACLE ENTERTAINMENT, INC., | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) Cause No. 49T10-1206-TA-34 |
| | ) |
| INDIANA DEPARTMENT OF STATE | ) |
| REVENUE, | ) |
| | ) |
| Respondent. | ) |

## ORDER ON THE PARTIES'
## CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT

**FOR PUBLICATION**
**June 3, 2015**

FISHER, Senior Judge

Pinnacle Entertainment, Inc. has appealed the Indiana Department of State Revenue's assessments of Indiana adjusted gross income tax for the 2006 and 2007 tax years. The matter, currently before the Court on the parties' cross-motions for partial summary judgment, presents two issues for the Court to decide:

I. Whether an apportioned sum of the gain generated by Pinnacle's sale of a racetrack and card club is attributable to this state under Indiana Code § 6-3-2-2.2; and if so,

II. Whether the Department correctly classified Pinnacle's gain as

business income.

## FACTS AND PROCEDURAL HISTORY

Pinnacle (f/k/a Hollywood Park, Inc.) is a Delaware corporation headquartered in Las Vegas, Nevada. (See Des'g Evid. Supp. Pet'r Mot. Partial Summ. J. ("Pet'r Des'g Evid."), Ex. 3 ¶¶ 1-2.) In April of 1999, Pinnacle owned and operated a pari-mutuel horse racing facility and an adjacent card club in Inglewood, California (collectively, "the Racetrack"). (See Pet'r Des'g Evid., Ex. 3 ¶¶ 12-15.)

On May 5, 1999, Pinnacle and Churchill Downs, Inc. executed an Asset Purchase Agreement, which provided that Pinnacle would sell the Racetrack to Churchill Downs for $140 million in cash. (See Pet'r Des'g Evid., Ex. 3. ¶ 15, Ex. 4 ¶ 6, Ex. A at 11.) On September 10, 1999, Churchill Downs placed $140 million cash into a qualified escrow account to facilitate the sale of the Racetrack. (See Pet'r Des'g Evid., Ex. 4 ¶¶ 7-10, Ex. B at 1-5.) The escrow holder issued a portion of the sale proceeds to Pinnacle in 1999 and the remainder in 2000. (See Pet'r Des'g Evid., Ex. 4 ¶¶ 9, 11-12, Ex. B at 1-5.) Pinnacle subsequently reported its gain from the sale under the installment method for federal income tax purposes.[1] (See Pet'r Des'g Evid., Ex. 4 ¶¶ 12-17, Exs. C-D.)

In 2000, Pinnacle filed an Indiana adjusted gross income tax return that classified the gain derived from the Racetrack sale as nonbusiness income. (See Hr'g Tr. at 17.) The Department, after auditing Pinnacle, reclassified Pinnacle's gain as business income, recalculated Pinnacle's net operating losses, and assessed Pinnacle with additional adjusted gross income tax, interest, and penalties for the 2006 and 2007 tax

---

[1] Under the installment method, "income recognized for any taxable year from a disposition is that proportion of the payments received in that year which the gross profit (realized or to be realized when payment is completed) bears to the total contract price." I.R.C. § 453(c) (1999).

2

years. (See Pet'r Des'g Evid., Ex. 3 ¶¶ 4-6; Resp't Des'g Evid. Opp'n Pet'r Mot. Summ. J. ("Resp't Des'g Evid."), Ex. B at 1-3.)

Pinnacle timely protested the Department's assessments. (Pet'r Des'g Evid., Ex. 3 ¶ 7.) On March 30, 2011, the Department issued a Letter of Findings that, with the exception of certain penalties, upheld each of the assessments. (See Pet'r Des'g Evid., Ex. 3 ¶ 8.) Pinnacle requested a rehearing, which the Department conducted on June 22, 2011. (See Pet'r Des'g Evid., Ex. 3 ¶¶ 9-10.) On April 26, 2012, the Department issued a Supplemental Letter of Findings, upholding the assessments. (See Pet'r Des'g Evid., Ex. 3 ¶ 11.)

On June 13, 2012, Pinnacle appealed to the Court. On August 28, 2013, Pinnacle filed a motion for partial summary judgment. The Department filed its motion for partial summary judgment on November 22, 2013.[2] On January 28, 2014, the Court held a hearing on the motions. Additional facts will be supplied as necessary.

## STANDARD OF REVIEW

Summary judgment is designed to provide speedy resolution to those cases – or those parts of cases – that may be determined as a matter of law because there are no factual disputes. Matonovich v. State Bd. of Tax Comm'rs, 705 N.E.2d 1093, 1096 (Ind. Tax Ct. 1999), review denied; Ind. Trial Rule 56(C) (stating that summary judgment is proper only when the designated evidence "shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law").

---

[2] Pinnacle has requested that the Court strike the portions of the Department's brief concerning the business income issue because its arguments were not responsive to Pinnacle's motion for partial summary judgment. (See Pet'r Reply Br. Supp. Mot. Partial Summ. J. ("Pet'r Reply Br.") at 4.) The Court denies Pinnacle's request because the Department's arguments serve as the basis for its cross-motion for partial summary judgment. See, e.g., In re Garden & Turf Supply Corp., 440 N.E.2d 710, 719 (Ind. Ct. App. 1982) (explaining that a party may move for summary judgment in its response brief).

3

In reviewing a motion for summary judgment, the Court will construe all properly asserted facts and reasonable inferences drawn therefrom in favor of the non-moving party. See Scott Oil Co. v. Indiana Dep't of State Revenue, 584 N.E.2d 1127, 1128-29 (Ind. Tax Ct. 1992). Cross-motions for summary judgment do not alter this standard. Horseshoe Hammond, LLC v. Indiana Dep't of State Revenue, 865 N.E.2d 725, 727 (Ind. Tax Ct. 2007), review denied.

## ANALYSIS & LAW

### I.

The first issue the Court must decide is whether an apportioned sum of the gain generated by Pinnacle's sale of the Racetrack was attributable to this state under Indiana Code § 6-3-2-2.2.[3] That statute, in relevant part, states that "receipts from assets in the nature of loans or installment sales contracts that are primarily secured by or deal with real or tangible personal property are attributable to this state if the security or sale property is located in Indiana." IND. CODE § 6-3-2-2.2(a) (1999). Pinnacle claims that under the plain terms of this statute, none of its gain was attributable to this state because it was not derived from an Indiana source. (See Hr'g Tr. at 32-33.) More specifically, Pinnacle explains that while the sales proceeds are receipts derived from an installment sales contract primarily concerning real property (i.e., the Asset Purchase

---

[3] The Department maintains that certain case law indicates that the Court should address Issue II first. (See Resp't Resp. Opp'n Pet'r Mot. Partial Summ. J. ("Resp't Resp. Br.") at 7; Hr'g Tr. at 20-21 (citing, e.g., Hunt Corp. v. Dep't of State Revenue, 709 N.E.2d 766, 771 (Ind. Tax Ct. 1999) (stating that "[i]n order to determine what income is attributable to Indiana, it must be first determined whether the income sought to be attributed is business or non-business income" (citation omitted))).) That case law is inapplicable here because it involved taxpayers that were in unitary relationships with other entities. See, e.g., Hunt, 709 N.E.2d at 767-68. When, as here, a case involves a single business entity, the Court has explained that it must determine whether the taxpayer's income was derived from an Indiana source before deciding whether the income is business or non-business income. See Chief Indus., Inc. v. Indiana Dep't of State Revenue, 792 N.E.2d 972, 976-77 (Ind. Tax Ct. 2000).

4

Agreement), the proceeds are not attributable to this state because the Racetrack was located in California, not Indiana. (See Br. Supp. Pet'r Mot. Partial Summ. J. ("Pet'r Br.") at 6-11.)

The Department, on the other hand, claims that because the Asset Purchase Agreement is not an installment sales contract, Indiana Code § 6-3-2-2.2 does not preclude the state's ability to tax a portion of Pinnacle's gain.[4] (See Resp't Resp. Opp'n Pet'r Mot. Partial Summ. J. ("Resp't Resp. Br.") at 10-12.) The parties' claims, therefore, indicate that the resolution of the issue turns on whether the Asset Purchase Agreement is an installment sales contract.

Indiana Code § 6-3-2-2.2 does not define the term "installment sales contract." See I.C. § 6-3-2-2.2. Therefore, the Court will give the term its plain, ordinary, and usual meaning as found in the dictionary. See Johnson Cnty. Farm Bureau Coop. v. Indiana Dep't State Revenue, 568 N.E.2d 578, 581 (Ind. Tax Ct. 1991), aff'd 585 N.E.2d 1336 (Ind. 1992). Black's Law Dictionary defines an "installment" as "a periodic partial payment of a debt." BLACK'S LAW DICTIONARY 868 (9th ed.) Webster's Dictionary states that an "installment" is "one of the portions into which a sum of money or a debt is divided for payment at set and usu[ally] regular intervals." WEBSTER'S THIRD NEW INT'L DICTIONARY 1171 (2002 ed.) Accordingly, the Court finds that an "installment sales contract" is a contract for the sale of property in which the buyer agrees to make periodic payments of a fixed sum to the seller, usually at regular intervals. Given this definition, the Court now turns to the terms of the Asset Purchase Agreement.

---

[4] Alternatively, the Department claims that even if the Asset Purchase Agreement is an installment sales contract, Indiana Code § 6-3-2-2.2 still does not preclude the state's ability to tax a portion of the gain because Pinnacle generated the proceeds by selling the Racetrack, not by selling the Asset Purchase Agreement itself. (See Resp't Resp. Br. at 10, 12 n.3.) The Court, however, need not address this claim to resolve the parties' motions.

5

With respect to the agreed upon purchase price of the Racetrack, the Asset Purchase Agreement states:

> Prior to Closing, the parties shall agree upon the purchase price for the Casino Building [(i.e., the card club)] and the purchase price for the other Assets, including the Real Property [(i.e., the racetrack)], (collectively, the "Purchase Price"), which amounts shall total: (a) $140,000,000 in cash; plus (b) the assumption of the Assumed Liabilities. In the absence of agreement prior to the Closing Date, the determination of the cash purchase price for the Casino Building shall be determined by appraisal to be performed by a "Big-Five" accounting firm mutually acceptable to [the parties].

(Pet'r Des'g Evid., Ex. 4 ¶ 6, Ex. A at 11.) The Asset Purchase Agreement also provides that Pinnacle could

> transfer the [racetrack] and/or the [card club] to [Churchill Downs] as part of a tax-deferred exchange by [Pinnacle] pursuant to [IRC § 1031][5], and that [Pinnacle] has the right to restructure all or a part of the [] transaction as provided in [IRC § 1031] as a concurrent or delayed (non-simultaneous) tax[-]deferred exchange for the benefit of [Pinnacle.]

(Pet'r Des'g Evid., Ex. 4 ¶ 6, Ex. A at 55-56 (footnote added).) Moreover, the Asset Purchase Agreement indicates that Churchill Downs would cooperate and, upon request, accommodate Pinnacle's tax-deferred exchange if certain liability, indemnification, and closing issues were met. (See Pet'r Des'g Evid., Ex. 4 ¶ 6, Ex. A at 56.)

There is no dispute that Pinnacle elected to restructure the sale of the Racetrack as a tax-deferred exchange consistent with both the terms of the Asset Purchase Agreement and IRC § 1031. (See Pet'r Des'g Evid., Ex. 4 ¶ 7.) Consequently, Churchill Downs received title to the Racetrack when it placed $140 million into a

---

[5] IRC § 1031 states that "[n]o gain or loss shall be recognized on the exchange of property held for productive use in a trade or business or for investment if such property is exchanged solely for property of like kind which is to be held either for productive use in a trade or business or for investment." I.R.C. § 1031(a)(1) (1999).

6

qualified escrow account in September 1999. (See Pet'r Des'g Evid., Ex. 4 ¶ 8, Ex. B at 2.) The escrow holder subsequently transferred $23 million, which represented the consideration for the card club, into another escrow account and Pinnacle received those funds at some point in 1999. (See Pet'r Des'g Evid., Ex. 4 ¶ 9, Ex. B at 1, 3.) Pinnacle received the remainder of the proceeds from the sale of the Racetrack in 2000, after its tax-deferred exchange failed because it did not locate a suitable exchange property within the required 180-day period. (See Pet'r Des'g Evid., Ex. 4 ¶ 11.) See also 26 C.F.R. § 1.1031(k)-1(b)(2)(ii) (1999).

Based on the totality of this evidence, the Court cannot say that the Assessment Purchase Agreement is an installment sales contract. Indeed, it does not require Churchill Downs to make periodic payments at regular intervals to Pinnacle for the purchase of the Racetrack. Rather, the terms of the Asset Purchase Agreement indicate that Churchill Downs would receive title to the Racetrack after it made a single payment of $140 million to the escrow holder. Moreover, the evidence indicates that the escrow holder remitted those proceeds to Pinnacle in two separate payments solely because Pinnacle did not locate a suitable exchange property within the prescribed period. Therefore, while Pinnacle was allowed to report its gain under the installment method for federal income tax purposes, that fact does not alter the terms of the Asset Purchase Agreement and transform it into an installment sales contract. Consequently, the Court grants summary judgment on this issue to the Department and against Pinnacle.

## II.

The next issue the Court must decide is whether the Department correctly

classified Pinnacle's gain as business income. "Business income" is "income arising from transactions and activity in the regular course of [a] taxpayer's trade or business and includes income from tangible and intangible property if the acquisition, management, and disposition of the property constitute integral parts of the taxpayer's regular trade or business operations." IND. CODE § 6-3-1-20 (1999). To decide whether a taxpayer's gains are business income, the Court will apply both the transactional and the functional tests. See May Dep't Stores Co. v. Indiana Dep't of State Revenue, 749 N.E.2d 651, 662-63 (Ind. Tax Ct. 2001).

## A. The Transactional Test

The transactional test arises from the first part of Indiana's statutory definition of business income – i.e., that business income "'means income arising from transactions and activity in the regular course of a taxpayer's trade or business.'" See id. at 658 (quoting I.C. § 6-3-1-20). "Under the transactional test, 'the controlling factor by which business income is identified is the nature of the particular transaction giving rise to the income.'" Id. (citation omitted). To determine whether a transaction generated business income, the Court may consider, among other things: "(1) the frequency and regularity of similar transactions; (2) the former practices of the business; and (3) the taxpayer's subsequent use of the income." Id. at 659 (citations omitted). See also 45 IND. ADMIN. CODE 3.1-1-30 (1999) (providing other factors that the Court may consider).

The Department contends that Pinnacle's gain from the sale of the Racetrack is business income because Pinnacle is in the business of buying and selling entertainment businesses. (See Resp't Resp. Br. at 8-9.) The Department claims that the fact that Pinnacle purchased and sold similar businesses both before and after it

8

sold the Racetrack supports this contention. (See Resp't Resp. Br. at 8-9.) (See also, e.g., Resp't Des'g Evid., Ex. E (indicating that Pinnacle purchased four entertainment businesses before selling the Racetrack and seven other entertainment businesses after the sale).)

Pinnacle, on the other hand, explains that while it operates certain assets such as pari-mutuel racing facilities and card clubs, it does not usually purchase or sell those assets in conducting its business. (See Pet'r Reply Br. at 8-10; Pet'r Supp'l Des'g Evid. Supp. Pet'r Mot. Partial Summ. J. ("Pet'r Supp'l Des'g Evid."), Ex. 5 ¶¶ 6-19.) Consequently, Pinnacle maintains that its sale of the Racetrack was an extraordinary event that was unrelated to its regular business operations. (See Pet'r Reply Br. at 9-10; Pet'r Supp'l Des'g Evid., Ex. 5 ¶¶ 14, 19.)

As previously explained, the determination of whether Pinnacle's gains are business income under the transactional test requires the Court to examine several factors, including the nature of Pinnacle's regular trade or business. See May, 749 N.E.2d at 659; 45 I.A.C. 3.1-1-30. Here, the Department's designated evidence supports its claim that Pinnacle was in the business of buying and selling entertainment businesses. Pinnacle's designated evidence, however, creates a genuine issue as to that material fact: its Vice President of Accounting and Finance averred that Pinnacle's business consisted of the operation of certain entertainment businesses, not the purchasing and selling of the businesses. See Hughley v. State, 15 N.E.3d 1000, 1004 (Ind. 2014) (stating that "[a]n issue of material fact 'is "genuine" if a trier of fact is required to resolve the parties' differing accounts of the truth'") (citation omitted). When, as here, the parties' evidence raises a genuine issue of material fact, the Court may not

9

grant summary judgment to the moving party because it is neither a substitute for trial nor a means for resolving factual disputes or conflicting inferences following from undisputed facts. See Owens Corning Fiberglass Corp. v. Cobb, 754 N.E.2d 905, 909 (Ind. 2001). Because there is a genuine issue of material fact as to the nature of Pinnacle's business, the Court cannot resolve this issue on summary judgment.[6]

## B. The Functional Test

The functional test arises from the second part of Indiana's statutory business income definition – i.e., that business income "'includes income from tangible and intangible property if the acquisition, management, and disposition of the property constitutes integral parts of the taxpayer's regular trade or business operations.'" See May, 749 N.E.2d at 659. "'[U]nder the functional test, all gain from the disposition of a capital asset is considered business income if the asset disposed of was 'used by the taxpayer in its regular trade or business operations[,]'" and "'the extraordinary nature or infrequency of the sale is irrelevant.'" Id. at 659-60 (citation omitted). Pinnacle's process of acquiring, managing, and disposing of the Racetrack, therefore, must have been integral to its regular trade or business operations. See id. at 664.

As just explained, the parties' evidence creates a genuine issue of material fact as to the nature of Pinnacle's trade or business. Consequently, the Court cannot determine whether Pinnacle's acquisition, management, and disposition of the

---

[6] The Department also claims that Pinnacle's former business practices and its use of the Racetrack sale proceeds indicate that the proceeds were business income. (See Resp't Resp. Br. at 9-10.) The Court, however, need not address these claims because there is a genuine issue of material fact regarding the nature of Pinnacle's business.

Racetrack were integral to its regular trade or business operations.[7] Accordingly, the Court finds that the Department has not shown that it is entitled to summary judgment on this basis either.[8]

## CONCLUSION

For the above-stated reasons, the Court, with respect to Issue I, GRANTS summary judgment in favor of the Department and against Pinnacle. With respect to Issue II, the Court DENIES summary judgment to either party. Accordingly, the Court ORDERS the parties to file a joint case management plan with proposed order within thirty (30) days.

SO ORDERED this 3rd day of June 2015.

_____
Thomas G. Fisher, Senior Judge
Indiana Tax Court

DISTRIBUTION:
Stephen H. Paul, Francina A. Dlouhy, Benjamin A. Blair, John P. Lowrey

---

[7] Even if the Court presumed that Pinnacle was solely in the business of operating pari-mutuel horse racing facilities, the Department would still not be entitled to summary judgment on this issue because it has not shown that the disposition of the Racetrack was integral to Pinnacle's business. (See Resp't Resp. Br. at 10 (arguing that the sale proceeds rather than the disposition of the property itself, were integral to Pinnacle's business).)

[8] Pinnacle has also claimed that a page of the Department's Audit Report and Pinnacle's Form 10-Ks are improperly before the Court because they either constitute hearsay or lack the proper certification, verification, and authentication. (See Pet'r Reply Br. at 5-8.) Moreover, Pinnacle has claimed that even if its gain were business income, the United States Constitution would restrict Indiana's ability to tax the entire apportioned sum of the gain. (See Pet'r Reply Br. at 12-13.) Given its resolution of Issue II, however, the Court need not address these claims.

11