ATTORNEYS FOR PETITIONERS:
**MICHAEL A. ROGERS**
**JACOB V. BRADLEY**
**MATTHEW S. CARR**
**JOSHUA B. FLEMING**
QUARLES & BRADY LLP
Indianapolis, IN

ATTORNEYS FOR RESPONDENT:
**CURTIS T. HILL, JR.**
INDIANA ATTORNEY GENERAL
**JESSICA R. GASTINEAU**
**ANDREW T. GREIN**
**WINSTON LIN**
DEPUTY ATTORNEYS GENERAL
Indianapolis, IN

**FILED**
Aug 15 2017, 4:30 pm
**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

# IN THE
# INDIANA TAX COURT

| | |
|---|---|
| WILLIAM E. SCHMIDT, JR. and DANIELLE SCHMIDT, | ) |
| | ) |
| | ) |
| Petitioners, | ) |
| | ) |
| v. | ) Cause No. 49T10-1306-TA-00055 |
| | ) |
| INDIANA DEPARTMENT OF STATE REVENUE, | ) |
| | ) |
| Respondent. | ) |

ON APPEAL FROM A FINAL DETERMINATION OF
THE INDIANA DEPARTMENT OF STATE REVENUE

**FOR PUBLICATION**
**August 15, 2017**

WENTWORTH, J.

William E. Schmidt, Jr. and his wife Danielle challenge the Indiana Department of State Revenue's assessments of adjusted gross income tax (AGIT) for the 2009, 2010, and 2012 tax years. The Schmidts assert that they were not subject to Indiana's AGIT because they were neither Indiana residents nor nonresidents who received Indiana source income during those years. The Court agrees.

**FACTS AND PROCEDURAL HISTORY**[1]

Mrs. Schmidt was born in Indiana, and Mr. Schmidt moved to Fort Wayne, Indiana at the age of sixteen. (Trial Tr. at 98-99, 103.) The Schmidts lived in various Indiana locations, and in 2005 they built a house and moved to Carmel, Indiana. (Trial Tr. at 19.) In mid-1999, Mr. Schmidt started an Indiana company, CopyCo, that sold and serviced copy machines, printers, fax machines, and typewriters. (Trial Tr. at 19, 100.) In August or September of 2006, the Schmidts sold CopyCo to Global Imaging Systems ("Global"), a company headquartered in Tampa, Florida. (Trial Tr. at 20-21.) Global continued to employ Mr. Schmidt as one of twenty core presidents across the nation responsible for growing the business, acquiring new business, and expanding its territories. (Trial Tr. at 21.) In addition, Mr. Schmidt was responsible for overseeing CopyCo's business in Indiana, Kentucky, Ohio, and Illinois. (Trial Tr. at 60-61.)

In April of 2007, Xerox acquired all the stock of Global and continued business operations in Indiana under the name CopyCo Office Solutions, a Xerox company. (Trial Tr. at 21-22.) Although Mr. Schmidt wanted to retire in 2007, he remained a Global employee to manage CopyCo's transition from Canon to Xerox products, to ensure the jobs of CopyCo's approximately 70 Indiana employees, and to continue to groom his long term employee and friend, John Drake, to take over as president. (Trial Tr. at 23, 60.) Mr. Drake was then executive vice president, responsible for CopyCo's day-to-day operations. (Trial Tr. at 59-63.)

---

[1] The parties offered evidence that contains confidential information. Accordingly, the Court will provide only that information necessary for the reader to understand its disposition of the issues presented. See generally Ind. Administrative Rule 9.

The Schmidts always wanted to move to Florida, and in the latter part of 2007, they began looking for houses there. (Trial Tr. at 25.) At the end of May 2008, they purchased a fully furnished house in West Palm Beach, Florida. (See Trial Tr. at 25-26; Pet'rs' Confd'l Trial Ex. 9.) The day of the closing the Schmidts moved in, and over the next ninety days, they moved their pictures, important papers, and sentimental items, including the family Bible, to their Florida house. (Trial Tr. at 26-27.) The Schmidts left their furniture in their Carmel house because it was not the type suitable for Florida and the Carmel house would show better furnished than unfurnished. (Trial Tr. at 27, 88.) Mr. Schmidt had a fully equipped office in the Florida house with a desk, phone, copier, scanner, fax machine, and computer so he could conduct his business from there. (Trial Tr. at 28.)

The Schmidts took one vehicle with them to Florida and retitled it there, and they purchased and titled another vehicle in Florida. (Trial Tr. at 45-48; Pet'rs' Tr. Exs. 14-15.) The Schmidts left their other three vehicles in Carmel. (Trial Tr. at 91-93.) In addition, the Schmidts obtained Florida driver's licenses, joined a Florida country club, and registered to vote and voted in Florida. (See Trial Tr. at 28, 50, 54-55; Pet'rs' Trial Exs. 10, 17, Pet'rs' Confd'l Trial Ex. 18.)

After moving to Florida, the Schmidts did not list their Carmel house for sale with a realtor right away because they feared the real estate market crash in 2008 and 2009 would cause it to sit on the market for a long time without selling. (Trial Tr. at 85-86.) They wanted to sell the house for the most they could get out of it and did not want to sell it in a "fire sale." (Trial Tr. at 86.) Nonetheless, Mr. Schmidt gave two realtors permission to show the house at any time, and they maintained the Carmel property, having it cleaned

3

every week, to keep it ready for showing to potential buyers. (Trial Tr. at 85-86, 88.) Between 2008 and 2012, the realtors showed the house to potential buyers twice. (Trial Tr. at 86-88.) In December 2014, the Schmidts hired a realtor, and sold the Carmel house in March or April of 2015 for a substantial loss. (Trial Tr. at 87-89.)

Prior to the due date of the first property tax installment for the 2009, pay 2010 tax year, the Schmidts notified the Hamilton County Auditor that they were no longer Indiana residents and asked her to remove the homestead deduction from their Carmel property. (Trial Tr. at 37-39; Pet'rs' Trial Ex. 19 (May 5, 2010 letter verifying that the Schmidts were not receiving the homestead deduction on the Carmel property.) Due to a problem in the Auditor's office, the 2009 and 2010 Indiana homestead deductions were not removed until 2013. (See Trial Tr. at 39-42; Pet'rs' Trial Exs. 19-21.) After their removal, the Schmidts were billed and paid the additional Indiana property tax for the 2009 and 2010 tax years. (Trial Tr. at 41-42; Pet'rs' Trial Ex. 21.)

On October 20, 2008, the Schmidts applied for the homestead credit on their Florida house. (Trial Tr. at 29-30.) Thereafter, the Schmidts received the Florida homestead credit beginning in 2009. (See Pet'rs' Trial Ex. 11; see also Trial Tr. at 35-36.)

From 2008 to 2010, Mr. Schmidt performed most of his duties as a Global core president from his Florida house. (Trial Tr. at 28, 59-63.) Specifically, he advised other core presidents on building their businesses and advised Mr. Drake over the telephone. (Trial Tr. at 60-61, 63.) Mr. Schmidt also attended quarterly meetings in Texas and Florida. (Trial Tr. at 61.) As a result, Mr. Schmidt did not perform any work at all while physically located in Indiana in either 2009 or 2010. (Trial Tr. at 73-76.) The Schmidts

4

visited their son and Mrs. Schmidt's parents in Indiana occasionally in 2009 and 2010, but spent fewer than 30 days in Indiana in each of those years. (Trial Tr. at 74-76.)

In June 2011, Mr. Drake passed away unexpectedly. (Trial Tr. at 77.) Mr. Schmidt returned to Indiana to take over Mr. Drake's duties, running CopyCo's day-to-day operations on an interim basis until December 2011. (Trial Tr. at 77-78.) During that period, Mr. Schmidt hired a new CopyCo president, John Bixby, who took over as president on the first business day of 2012. (Trial Tr. at 78-79.)

Mr. Schmidt remained employed by Global in 2012 solely for the purpose of advising Mr. Bixby, if necessary. (Trial Tr. at 80.) In that capacity, Mr. Schmidt returned to Indiana only twice in 2012: once for three or four hours at the January kick-off meeting to announce his departure and introduce Mr. Bixby as the new president and again in April for three or four hours to assist with a service operator problem. (Trial Tr. at 80-81, 84.) Mr. Schmidt officially retired from Global in December 2012. (See Trial Tr. at 84-85.)

The Schmidts filed Indiana Part-Year or Full-Year Nonresident Individual Income Tax Returns (Form IT-40 PNR) for 2008, 2011, and 2012, reporting Mr. Schmidt's income from work performed when he was physically in Indiana in 2008 and 2011 and Mrs. Schmidt's lottery winnings in 2012. (Trial Tr. at 78, 81; Pet'rs' Confd'l Trial Exs. 6-8.) On their returns, the Schmidts identified themselves as Florida residents and listed their Florida address. (See Trial Tr. at 78-79; Pet'rs' Confd'l Trial Exs. 6-8.)

The Schmidts did not file Indiana income tax returns for 2009 or 2010. (See Pet'rs' Confd'l Trial Exs. 2009 "Investigation Summary" at 4, 2010 "Investigation Summary" at 3.) On November 4, 2011 and December 7, 2012, however, the Department issued

5

Proposed Assessments against the Schmidts for AGIT liabilities for both 2009 and 2010. (See Pet'rs' Confd'l Trial Exs. 2009 "Proposed Assessment," 2010 "Proposed Assessment.")

In 2012, Mr. Schmidt received a stock grant award as part of his compensation for his services as core president, and Global withheld Indiana income tax on the award in the amount of $2,542.99. (Trial Tr. at 83.) Believing the withholding was a mistake, the Schmidts filed a claim for refund for the entire amount withheld. (Trial Tr. at 83; Pet'rs' Confd'l Trial Exs. 2012 "Proposed Assessment," 2012 "Letter of Findings" at 2.) On December 2, 2013, the Department denied the Schmidts' 2012 claim for refund and assessed additional income tax and penalties because Mr. Schmidt worked in Indiana for a portion of the year. (See Pet'rs' Confd'l Trial Ex. 2012 "Letter of Findings" at 4, 7.)

The Schmidts timely protested the Proposed Assessments and the denial of their refund claim, which were denied by the Department along with the Schmidts' subsequent requests for rehearing. (See Pet'rs' Confd'l Trial Exs. 2009 "Letter of Findings" at 3; 2010 "Letter of Findings" at 4; 2012 "Letter of Findings" at 4.) On June 14, 2013, the Schmidts filed an original tax appeal challenging the Department's 2009 and 2010 Proposed Assessments and on June 12, 2015, filed another original tax appeal challenging the Department's 2012 Proposed Assessment. On March 3, 2016, the Court granted the parties' motion to consolidate the two appeals and conducted a trial on August 31, 2016. The Court heard oral argument on February 2, 2017. Additional facts will be added if necessary.

**STANDARD OF REVIEW**

The Court reviews final determinations of the Department <u>de novo</u>. <u>See</u> IND. CODE §§ 6-8.1-5-1(i), -9-1(c) (2017). Accordingly, the Court is not bound by either the evidence or the issues presented to the Department at the administrative level. <u>See</u> <u>Horseshoe Hammond, LLC v. Indiana Dep't of State Revenue</u>, 865 N.E.2d 725, 727 (Ind. Tax Ct. 2007), <u>review denied</u>.

A proposed assessment is <u>prima</u> <u>facie</u> evidence that the Department's assessment for the unpaid tax is valid. I.C. § 6-8.1-5-1(c). Accordingly, "[t]he burden of proving that the proposed assessment is wrong rests with the person against whom the proposed assessment is made." I.C. § 6-8.1-5-1(c). Courts will not extend the force and operation of tax statutes beyond the clear import of their language and will construe statutes in favor of the taxpayer when in doubt about the imposition of a tax. <u>Indiana Dep't of State Revenue v. Safayan</u>, 654 N.E.2d 270, 272 (Ind. 1995).

**LAW**

During the years at issue, Indiana imposed a tax at the rate of 3.4% on the adjusted gross income (AGI) of resident persons and on that part of the AGI derived from sources within Indiana of every nonresident person. <u>See</u> IND. CODE § 6-3-2-1(a) (2009). The Indiana Code defines a "resident" as "(a) any individual who was domiciled in this state during the taxable year, or (b) any individual who maintains a permanent place of residence in this state and spends more than one hundred eighty-three (183) days of the taxable year within this state[.]" IND. CODE § 6-3-1-12 (2009). <u>See</u> also 45 IND. ADMIN. CODE 3.1-1-21 (2009) (see http://www.in.gov/legislative/iac/).

Indiana's Supreme Court has stated that "[d]omicile means 'the place where a person has his true, fixed, permanent home and principal establishment, and to which place he has, whenever he is absent, the intention of returning.'" State Election Bd. v. Bayh, 521 N.E.2d 1313, 1317 (Ind. 1998) (citation omitted). Moreover, the Department has explained in its regulation:

> For the purposes of [the Adjusted Gross Income Tax Act of 1963], a person has only one domicile at a given time even though that person maintains more than one residence at that time. Once a domicile has been established, it remains until the conditions necessary for a change of domicile occur.
>
> In order to establish a new domicile, the person must be physically present at a place, and must have the simultaneous intent of establishing a home at that place. It is not necessary that the person intend to remain there until death; however, if the person, at the time of moving to the new location, has definite plans to leave that new location, then no new domicile has been established.
>
> *    *    *    *    *
>
> Relevant facts in determining whether a new domicile has been established include, but are not limited to:
> (1) Purchasing or renting residential property
> (2) Registering to vote
> (3) Seeking elective office
> (4) Filing a resident state income tax return or complying with the homestead laws of a state
> (5) Receiving public assistance
> (6) Titling and registering a motor vehicle
> (7) Preparing a new last will and testament which includes the state of domicile.

45 IND. ADMIN. CODE 3.1-1-22 (2009) (amended 2017) (see http://www.in.gov/legislative/iac/).

A nonresident person is defined as "any person who is not a resident of Indiana." IND. CODE § 6-3-1-13 (2009). See also 45 IND. ADMIN. CODE 3.1-1-24 (2009) (see http://www.in.gov/legislative/iac/). Central to the taxation of nonresidents, Indiana Code

8

§ 6-3-2-2 defines the term "adjusted gross income derived from sources within Indiana" as:

> (1) income from real or tangible personal property located in this state;
> (2) income from doing business in this state;
> (3) income from a trade or profession conducted in this state;
> (4) compensation for labor or services rendered within this state; and
> (5) income from stocks, bonds, notes, bank deposits, patents, copyrights, secret processes and formulas, good will, trademarks, trade brands, franchises, and other intangible personal property if the receipt from the intangible is attributable to Indiana under [Indiana Code § 6-3-2-2.2].

IND. CODE § 6-3-2-2(a) (2009) (amended 2011).

## ANALYSIS

The Schmidts challenge the Department's 2009 and 2010 Proposed Assessments on the basis that they were neither Indiana residents nor nonresidents who derived AGI from sources within the state during those years. The Schmidts also challenge the Department's denial of their 2012 claim for refund and assessment of additional AGIT, asserting that any income derived from Indiana sources that year was de minimus and should not be subject to tax.

### I. Indiana Residents

The Department issued its Proposed Assessments on the basis that the Schmidts were domiciled in Indiana during the years at issue. (See Resp't Post-Trial Br. ("Resp't Br.") at 5.) The Schmidts, however, assert that although they were residents domiciled in Indiana prior to 2008, they were not during any of the years at issue, having established a new domicile in Florida in 2008. (See Pet'rs' Post-Trial Br. ("Pet'rs' Br.") at 11-14.)

The Indiana Supreme Court has explained that to change domicile, "[T]here must be the intention to abandon the old domicile; the intention to acquire a new one; and

9

residence in the new place[.]" Bayh, 521 N.E.2d at 1317 (emphases added). Necessarily then, a person's intention is the critical element for determining whether one's domicile has changed. Accordingly, "[p]hysical presence in a place is only one circumstance in determining domicile[;]" there must also be 'evidence of acts undertaken in furtherance of the requisite intent, which makes the intent manifest and believable.'" Id. at 1318. Indeed, "[i]ntent and conduct must converge to establish a new domicile." Id.

Here, the Schmidts presented unrebutted testimony that they intended to abandon their Indiana domicile and acquire a new domicile in Florida. (See Trial Tr. at 59, 96.) Moreover, they provided evidence that they undertook acts in furtherance of their intent: (1) they purchased a residence in Florida, (2) they registered to vote in Florida, (3) they applied for and received a homestead credit on their Florida residence, and (4) they titled and registered vehicles in Florida. In addition, they ultimately sold the house in Carmel; they voted in Florida; and they surrendered their Indiana driver's licenses. All of these facts are expressly relevant to determine whether a new domicile had been established under the Department's regulation. See 45 I.A.C. 3.1-1-22.

The Department's regulation also expressly stated that it did not provide an exclusive listing of all the relevant factors to be considered. Thus, other relevant factors supporting the Schmidt's intention to change their domicile include testimony that they had always wanted to move to Florida, performance of core president duties from a Florida home office, relocation of all their most important possessions to Florida, and membership in a Florida country club. Moreover, Mr. Schmidt specifically testified that he had no intention during 2008 to 2015 to return to Indiana to live. (See Trial Tr. at 59.)

10

While the Schmidts continued to own the residence in Carmel during the years at issue, they spent fewer than thirty days in Indiana during each of the relevant years. (See Trial Tr. 73-76 (explaining that they were in Indiana to visit family members).) Moreover, they were physically present in Florida for more than 183 days in each of the years at issue and had always returned to Florida after any absences. (Trial Tr. at 58, 74-76, 80-81.) In addition, no evidence was presented that indicated the Schmidts had definite plans to leave Florida to establish a different domicile.

Despite this evidence, the Department contends that its Proposed Assessments are valid because, contrary to their professed intention, the Schmidts still: (1) owned a house and cars in Indiana; (2) maintained relationships with their Indiana physician and accountant; (3) received monthly statements from their Florida country club at the Carmel house;[2] and (4) Mr. Schmidt provided services to an Indiana company. (See Resp't Br. at 7-8.) The Department's arguments are not persuasive for three reasons.

First, the Department's own regulation acknowledges that the ownership of multiple residences had little bearing, in and of itself, on the location of one's domicile. See 45 I.A.C. 3.1-1-22 (stating that "a person has only one domicile at a given time even though that person maintains more than one residence at that time"). Accordingly, multiple residences merely set the stage for an inquiry into all the relevant facts to determine whether a person intends to change domiciles, as the Court does now.

Second, the Department reasons that the Schmidts must have intended to return to Indiana because they maintained relationships with their Indiana healthcare

---

[2] Mr. Schmidt testified that because he and his wife joined the country club prior to purchasing their Florida house, they provided the club with their only active address at that time. (Trial Tr. at 50-52.)

professional and accountant.  (See Resp't Br. at 7-8.)  This reasoning is a non sequitur and is unsupported by any evidence.  These types of relationships are unlikely ties that bind especially given Mr. Schmidt's testimony that he had gotten prescriptions from the Indiana doctor without making a visit, and although his accountant was in Indiana, his other financial advisors were based all around the country.  (Trial Tr. at 102.)

Finally, Mr. Schmidt consistently provided his services to CopyCo from locations outside Indiana during the years at issue.  (See Trial Tr. at 28, 59-63, 73-76, 80.)  To infer that the Schmidt's intended to remain domiciled in Indiana from the evidence that Mr. Schmidt provided personal services to an Indiana company is an unreasonable leap of logic given that he was not physically present in Indiana during this period.  Based on the facts, therefore, the Court concludes that the Schmidts were domiciled in Florida during the years at issue and were not Indiana residents for purposes of imposing AGIT.

## II. Indiana Source Income

The Department claims that even if the Schmidts weren't Indiana residents, the Proposed Assessments are correct because Mr. Schmidt received income derived from sources within Indiana during the years at issue.  (See Resp't Br. at 9.)  Specifically, the Department explains that Mr. Schmidt was compensated by an Indiana company for services rendered within the state of Indiana.  (Resp't Br. at 10.)

The Schmidts disagree, however, claiming their income did not come from an Indiana source.  (See Pet'rs' Br. at 11-16.)  Specifically, the Schmidts claim that Mr. Schmidt was not physically present in Indiana in 2009 and 2010, and the services he performed while physically present in Indiana in 2012 were de minimus.  (See Pet'rs' Br. at 11.)

## A. Compensation From Services Rendered Within Indiana

Indiana imposes tax on that part of every nonresident's AGI derived from sources within Indiana. I.C. § 6-3-2-1(a). The Court has previously explained how to determine whether a corporate entity has derived income from an Indiana source. See e.g., U-Haul Int'l v. Indiana Dep't of State Revenue, 826 N.E.2d 713, 716 (Ind. Tax Ct. 2005) (applying the three-part "critical transaction" test), review denied. Nonetheless, this is the first time the Court has been asked to determine the source of an individual taxpayer's income.

"[AGI] derived from sources within Indiana" includes, among other things, "compensation for labor or services rendered within this state[.]" I.C. § 6-3-2-2(a)(4). The parties' dispute centers around whether the words "within this state" require an individual's personal services to be performed while physically present in the state.

"Words and phrases shall be taken in their plain, or ordinary and usual, sense." IND. CODE § 1-1-4-1 (2009). The plain meaning of the words "within this state" is understood from its part of speech – an adverbial prepositional phrase modifying the preceding prepositional phrase, "for labor or services rendered," that is an adjective. See THE CHICAGO MANUAL OF STYLE §§ 5.173-5.175 at 248 (16th ed. 2010). This juxtaposition indicates that the rendering of labor or services must be done in Indiana. Indeed, both prepositional phrases limit the noun "compensation:" the adjectival phrase modifying "compensation" answering the question 'what compensation?' and the adverbial phrase modifying "for labor and services rendered" answering the question 'where are the services rendered?' See id. See also Chief Indus. v. Indiana Dep't of State Revenue, 792 N.E.2d 972, 977 (Ind. Tax Ct. 2000) (stating that "[a] plain reading of [Indiana Code § 6-3-2-2(a)(1)-(4)] indicates that the General Assembly considered Indiana source

13

income to be income derived from income-producing activities undertaken, performed, or conducted either 'in this state' or 'within this state'"); Indiana Dep't of State Revenue v. Convenient Indus. of Am., Inc., 299 N.E.2d 641, 645 (Ind. Ct. App. 1973) (stating "the derivation of the income must be attributable to activity within the state as opposed to the person from whom the income is received" (citations omitted)).

The unrebutted evidence shows that in 2009 and 2010, Mr. Schmidt rendered services for CopyCo from outside the state by telephone and did not perform any personal services while physically located in Indiana. (See Trial Tr. at 73-76.) Accordingly, the Department's reasoning that Mr. Schmidt received Indiana source income because he performed services for an Indiana company is incorrect because he was not physically present in Indiana as required by the plain meaning of the imposition statute.

### B. 2012

The Schmidts do not dispute that in 2012 Mr. Schmidt received AGI from services rendered while he was physically present in Indiana, but they claim they should escape taxation because his services performed in Indiana were de minimus. (See Pet'rs' Br. at 11-16.) Both this Court and the Indiana Court of Appeals have recognized that a taxpayer domiciled outside Indiana is not subject to tax if the income earned from Indiana sources is "minimal" or "incidental" in comparison to the services performed outside Indiana. See U-Haul, 826 N.E.2d at 717; Convenient Indus., 299 N.E.2d at 645 (both parsing similar imposition language in the Indiana Gross Income Tax Act to require the activities within Indiana be more than minimal to trigger taxation). Accordingly, the eight hours that Mr. Schmidt worked over the course of 2012 are so minimal that no Indiana income tax is owed.

14

In addition, Mr. Schmidt received stock grants every year, which vested after three years, as part of his compensation and as an incentive to remain employed by the company. (See Trial Tr. at 24, 83.) Global withheld $2,542.99 for Indiana state income taxes on the 2012 proceeds of his stock award even though he worked such a small amount of time in Indiana. (See Trial Tr. at 83; Pet'rs' Confd'l Trial Ex. 23 at 1.)

The Department denied the Schmidts' refund claim. A nonresident's income from stocks is taxable Indiana source income "to the extent that the income is <u>apportioned</u> to Indiana . . . or if the income is <u>allocated to</u> Indiana <u>or</u> considered to be <u>derived from sources within Indiana</u> under [Indiana Code § 6-3-2-2]."[3] IND. CODE § 6-3-2-2(a)(5) (2012) (emphases added). The stock proceeds at issue here are not apportioned, allocated, or considered to be derived from sources within Indiana in any part of Indiana Code § 6-3-2-2. Moreover, because Mr. Schmidt had no taxable presence in Indiana during the years at issue, his stock proceeds were not "for labor or services rendered <u>within this state</u>" under Indiana Code § 6-3-2-2(a)(4).

## CONCLUSION

The Schmidts have rebutted the presumption of validity afforded to the Department's Proposed Assessments. For all the reasons stated above, the Department's Proposed Assessments are REVERSED. Accordingly, the Schmidts are not liable for Indiana AGIT, penalties, or interest during the years at issue, and they are entitled to the refund claimed.

---

[3] In 2011, Indiana Code § 6-3-2-2(a)(5) was amended, replacing the language "if the receipt from the intangible is attributable to Indiana under section 2.2 of this chapter" with "to the extent that the income is apportioned to Indiana under this section or if the income is allocated to Indiana or considered to be derived from sources within Indiana under this section." Compare IND. CODE § 6-3-2-2(a)(5) (2009) with IND. CODE § 6-3-2-2(a)(5) (2011).

15